**VOLKSWAGEN OF AMERICA, INC., Petitioner,**

v.

**Andrew RAMIREZ, Sr., et al., Respondents.**

No. 02–0557.

Supreme Court of Texas.

Argued April 23, 2003.

Decided Dec. 31, 2004.

Rehearing Denied March 11, 2005.

---

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■

Ben Taylor, Fulbright & Jaworski L.L.P., Dallas, Roger W. Hughes, Adams & Graham, L.L.P., Harlingen, Rafael Edward Cruz and Joseph Hughes, Warren W. Harris, Bracewell & Giuliani LLP, Houston, David M. Prichard, Brendan K. McBride, Prichard, Hawkins & Young, LLP, San Antonio, for amicus curiae.

C. Thomas Schweizer, Lynne Liberato, Kent Rutter, Alene Ross Levy, Haynes and Boone, LLP, Timothy R. Bersch, Houston, Eduardo R. Rodriguez, Rodriguez, Colvin, Chaney & Saenz, L.L.P., Brownsville, Ian Ceresney, Herzfeld & Rubin, P.C., New York, NY, for petitioner.

Michael James Garza, McAllen, Albert A. Munoz II, David H. Hockema, Hockema, Tippit & Escobedo, L.L.P., Roger Reed, Reed, Carrera & McLain, L.L.P., Edinburg, David M. Gunn, Kevin H. Dubose, Alexander Dubose Jones & Townsend, LLP, Houston, Douglas Alexander, for respondent.

Justice WAINWRIGHT delivered the opinion of the Court in which Justice HECHT, Justice OWEN, Justice SMITH, Justice BRISTER, and Justice MEDINA joined.

In this case, we consider whether there was sufficient evidence to support a jury's finding that a defect in an automobile manufactured by Volkswagen of America, Inc. was the proximate cause of a fatal two-car accident. After a unanimous jury returned a defense verdict, the trial court granted a motion for new trial and the second jury returned a verdict awarding substantial monetary damages. Because we hold that the evidence was not legally sufficient to support causation, we reverse the judgment of the court of appeals and render a take-nothing judgment in favor of Volkswagen.

## I. Factual and Procedural Background

On November 26, 1996, Haley Sperling was driving a 1996 Volkswagen Passat eastbound on U.S. 83, a divided highway with two lanes of traffic in each direction. The eastbound and westbound lanes of U.S. 83 are separated by a grass median that gently slopes down from both sides of the highway to a flat concrete strip in the median's center. Sperling was traveling in the inside eastbound lane as she approached a Camaro heading in the same direction in the outside lane. The two cars bumped twice, after which Sperling's car immediately crossed the median and collided nearly head-on with a Ford Mustang traveling westbound on U.S. 83. The Mustang was driven by Diana Ramirez Guerra (Guerra) and occupied by her fourteen-year old daughter, Jacquelyn Guerra (Jackie). Sperling and Guerra died as a result of the collision, and Jackie suffered severe head trauma. Andrew Ramirez Sr., Ester Ramirez, and Andrew Ramirez Jr., as administrator of Guerra's estate and next friend of Jackie (collectively the Ramirezes), sued Volkswagen, alleging that a defect in the Passat caused the accident.

In the first trial, the jury returned a unanimous verdict in favor of Volkswagen. The trial court rendered a take-nothing judgment against the Ramirezes but subsequently granted a motion for new trial under Texas Rule of Civil Procedure 320, relying on the familiar refrain—"in the interest of justice." [1] As with the first trial, the focus of the second trial was whether a defect in the Passat's left rear

---

1. *See In re Volkswagen of America, Inc.,* 22 S.W.3d 462 (Tex.2000) (dissent to denial of a petition for writ of mandamus concerning the issue of granting motions for new trial in the interest of justice without additional explanation).

wheel assembly caused the accident. The parties do not dispute that the wheel separated from the Passat, but they do dispute when the wheel assembly detached and whether the detachment caused the accident or resulted from it. Crucial to this difference of opinion is the undisputed fact that after the collision, the left rear wheel of the Passat was found completely detached from the car's stub axle and lying on its side, positioned directly under the left rear wheel well. The Ramirezes argued that the wheel separation occurred while Sperling traveled in the eastbound lanes of U.S. 83, causing her to lose control of the vehicle, cross the median, and collide with Guerra's Mustang. To support this theory, the Ramirezes offered the testimony of Ronald Walker, their accident reconstruction expert.

Walker testified that while the Passat was traveling in the eastbound lanes of U.S. 83, its left rear wheel detached from the stub axle but stayed "tucked underneath" the left rear wheel well as the car entered and fishtailed across the grass and concrete median at 50 to 60 miles per hour, collided with the Mustang, and spun partially around before coming to rest. Walker further testified that the "laws of physics" explain how the wheel was able to remain pocketed in the rear wheel well throughout the turbulent accident sequence. Walker opined that a defect in the wheel was the proximate cause of the accident. Volkswagen contends that Walker's testimony was unreliable because he did not present any scientific support for his opinion that a wheel could behave in the manner he described. Specifically, Volkswagen complains that Walker failed to conduct tests, cite studies, or perform calculations to support of his "floating wheel" theory. In addition to the expert testimony, at trial the Ramirezes showed a videotaped interview of an unidentified witness at the scene of the accident who purported to see the Passat's tire blow up before it crossed the median and collided with the Mustang.

Volkswagen contested the existence of any defect and argued that the accident was due to Sperling's reaction to the contact between her car (the Passat) and the Camaro. Volkswagen offered expert testimony to support its position that the Passat's wheel separation was a *result* of the accident and not the *cause* of the accident. Volkswagen also claimed that the unidentified witness's testimony was unreliable hearsay.

In response to Volkswagen's assertion that there was no evidence of causation, the Ramirezes counter that their metallurgical expert, Edward Cox, provided evidence that the defect caused the accident. In this Court, Volkswagen does not challenge the reliability of Cox's testimony that a defect existed in the left rear wheel assembly, but does assert that Cox was not offered to opine on causation and his brief opinion that the defect caused the accident constitutes no evidence to support the verdict. Cox testified that because there was grass in the grease in the wheel hub, the left rear wheel assembly must have come off before the Passat entered the median and therefore caused the accident. Cox does not attempt to explain how the left wheel remained "tucked" in the left rear wheel well throughout the accident sequence.

In the second trial, the jury returned a 10 to 2 verdict in favor of the Ramirezes. Volkswagen moved for judgment not withstanding the verdict, arguing that the trial court wrongfully admitted unreliable expert testimony that was legally insufficient to support the jury's finding. The trial court denied Volkswagen's motion and entered a final judgment awarding the Ramirezes over seventeen million dollars in

damages. Volkswagen subsequently moved for a new trial on the basis that the verdict was rendered by only nine qualified jurors. Volkswagen learned that one of the ten jurors who signed the verdict was a convicted felon, which it argued disqualified him from serving on the jury. The trial court denied the motion.

Volkswagen appealed the trial court's judgment. Among the issues presented to the court of appeals was Volkswagen's contention that there was no evidence of negligence to support the jury's verdict because the testimony of Walker and Cox was unreliable and therefore had to be disregarded. Volkswagen also alleged that the trial court abused its discretion by allowing the Ramirezes to present the videotaped statement of the unidentified witness because the testimony constituted inadmissible hearsay. Volkswagen further argued that one of the jurors who was convicted of a felony was disqualified from serving on the jury because article 42.12, section 20 of the Texas Code of Criminal Procedure, which grants Texas courts the power to discharge a convicted felon from the disabilities of a felony, is unconstitutional. Lastly, Volkswagen claimed that the trial court abused its discretion by discarding the initial judgment for Volkswagen and granting a motion for new trial.

The court of appeals affirmed the judgment of the trial court. 79 S.W.3d 113, 128. It concluded that Walker's and Cox's testimony met the common law standards for reliability and the unidentified witness's statements did not constitute hearsay. *Id.* at 122, 124–25. The court of appeals denied Volkswagen's juror claim, holding that article 42.12, section 20 of the Texas Code of Criminal Procedure is constitutional, and a dismissal of a conviction under the statute restores the right of a convicted felon to serve on a jury. *Id.* at 120–21. Additionally, the court declined to

review the trial court's order granting the Ramirezes' motion for a new trial, stating that the trial court's order granting a new trial is not subject to review from a final judgment. *Id.* at 128 (citing *Cummins v. Paisan Constr. Co.*, 682 S.W.2d 235, 235–36 (Tex.1984) (per curiam)).

Volkswagen petitioned this Court for review. Since we conclude that there was no evidence to support causation, we do not reach Volkswagen's challenge to the trial court's order granting a new trial or to the constitutionality of article 42.12, section 20 of the Texas Code of Criminal Procedure.

## II. Legal Sufficiency Review

A party may raise a properly preserved complaint on appeal that scientific evidence is unreliable and thus no evidence to support a judgment. *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711–12 (Tex.1997); *see also Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232–33 (Tex.2004). When reviewing a no evidence challenge, we consider only the evidence that tends to support the jury's finding. *Kerr–McGee Corp. v. Helton*, 133 S.W.3d 245–54 (Tex. 2004); *Havner*, 953 S.W.2d at 711; *see also Coastal Transp.*, 136 S.W.3d at 233–34 (applying same standard to directed verdict). "A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Havner*, 953 S.W.2d at 711 (citing Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L.Rev. 361, 362–63 (1960)).

Volkswagen argues that neither Walker's testimony, claimed to be unreliable,

nor the unidentified witness's statements, asserted to be hearsay, are competent evidence. Accordingly, Volkswagen claims there is no evidence to support the Ramirezes' theory that a defect in the Passat's left rear wheel assembly caused Sperling to lose control of the vehicle, veer across the median, and collide with Guerra's Mustang. In response, the Ramirezes assert that their metallurgical expert, Edward Cox, provided legally sufficient evidence that Volkswagen caused the accident. Volkswagen argues that Cox's testimony is not legally sufficient to support a finding of causation because it does not explain Walker's "tucked wheel" opinion or establish when in the accident sequence the bearing failure caused the wheel to detach from the Passat. In reviewing Volkswagen's no evidence point, we determine whether Walker's testimony meets the standards of reliability and whether the unidentified witness's statements fall within a hearsay exception. If the testimony of Walker and the unidentified witness do not survive Volkswagen's no evidence challenge, then we must determine whether in the remaining evidence there is more than a scintilla of evidence that supports the Ramirezes' theory of causation. *Havner*, 953 S.W.2d at 711; *see also Coastal Transp.*, 136 S.W.3d at 233–34.

### A. Ronald Walker

 The Ramirezes proffered Walker's testimony to prove that a bearing defect in the left rear wheel assembly of the Passat driven by Sperling caused her initially to lose control of the vehicle and subsequently collide with the Mustang driven by Guerra. Crucial to Walker's opinion is his theory that the left rear wheel of the Passat detached from the stub axle and stayed tucked underneath the left rear wheel well as the car entered and crossed the grass and concrete median, collided with the

Mustang, and spun partially around before coming to rest. Walker proposed that the "laws of physics" explain how the wheel was able to remain pocketed in the rear wheel well throughout the turbulent accident sequence:

> [E]ven with the wheel dropping off, the wheel wanted to still have the capability of going faster than the vehicle because it wasn't being slowed down as much by friction. And so consequently, it could follow the vehicle across the median.

Volkswagen contends that this testimony is unreliable because he did not present any scientific support for his opinion that it was physically possible for a wheel to behave in the manner he described, or that the wheel in this case did behave as described. Specifically, Volkswagen complains that Walker failed to conduct tests, cite studies, or perform calculations in support of his "floating wheel" theory.

 Texas Rule of Evidence 702 permits a witness qualified as an expert by "knowledge, skill, experience, training, or education" to testify on "scientific, technical, or other specialized" subjects if the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." To meet these standards, an expert must not only be qualified, but his proposed testimony must be relevant and reliable. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex.1995). Expert testimony is unreliable if it is not grounded "in the methods and procedures of science" and is no more than "subjective belief or unsupported speculation." *Robinson*, 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Expert testimony is also unreliable if there is too great an analytical gap between the data on which the expert relies and the

opinion offered. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex.1998); *see also Havner,* 953 S.W.2d at 714 (reasoning that an expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology).

■ In *Robinson,* we identified six non-exclusive factors that trial courts should consider to determine whether an expert's testimony is reliable and thus admissible. 923 S.W.2d at 557. These factors include, but are not limited to:

1. the extent to which the theory has been or can be tested;

2. the extent to which the technique relies upon the subjective interpretation of the expert;

3. whether the theory has been subjected to peer review and/or publication;

4. the technique's potential rate of error;

5. whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

6. the non-judicial uses which have been made of the theory or technique.

*Id.*

In this case, the court of appeals upheld the trial court's decision to permit Walker to opine on his theory of the accident. 79 S.W.3d at 125. The court of appeals relied on our holdings in *Helena Chemical* and *Gammill* to conclude that the *Robinson* factors do not apply to Walker's testimony. *Id.* at 124 n. 3. The court of appeals, however, misinterprets these cases.

In *Helena Chemical* and *Gammill,* we recognized that the factors listed in *Robinson* for measuring the reliability of scientific evidence cannot be used with certain kinds of expert testimony. *Helena Chem.,* 47 S.W.3d at 499; *Gammill,* 972 S.W.2d at 726. However, there still must be some basis for the opinion offered to establish its reliability. *Helena Chem.,* 47 S.W.3d at 499; *Gammill,* 972 S.W.2d at 726. In some situations, the witness's skill and experience alone may provide a sufficient basis for the expert's opinion. Tex.R. Evid. 702; *Gammill,* 972 S.W.2d at 726. That, however, is not the circumstance in this case.

Walker maintains that his explanation of how the wheel could separate from the Passat's stub axle and remain tucked in the wheel well throughout the accident sequence is based upon generally accepted scientific principles. He testified that "[a]ccident reconstruction is basically application of laws of physics with respect to . . . describing the motion of [sic] vehicle before a collision, during a collision, and after a collision using basic scientific and some engineering principles, but all abiding by the laws of physics."

■ Walker did not conduct or cite any tests to support his theory that the Passat's left rear wheel could and did remain pocketed in the wheel well as the car veered off U.S. 83, crossed the median, and collided with the Mustang. Walker admits that he had not read any publications or seen any studies that corroborate his findings.[2] Although Walker and Cox conducted tests in this case, the tests related to *how* the bearing failed and not *when* in the accident sequence the bearing failed.[3] Importantly, Walker never ex-

---

**2.** While we do not hold that publication is a prerequisite for scientific reliability in every case, courts should be "especially skeptical" of scientific evidence that has not been published or subjected to peer review. *Havner,* 953 S.W.2d at 727.

**3.** Walker stated that he reviewed crash tests, rollover tests, and curb strike tests conducted

plains how these tests support his conclusions that the Passat's wheel remained with the car throughout the accident sequence to support his theory that the wheel separation was the cause of the accident and not the result of the accident.

Walker does not answer an important question. If the left rear wheel separated from the axle while the Passat was in the eastbound lanes, how could it remain "tucked" in the wheel well through events that occurred at 50 to 60 miles per hour and ultimately produced sufficient force to result in the deaths of two people? The answer is not within common knowledge and requires expert testimony. Walker's reliance on the "laws of physics", without more, is an insufficient explanation. Although Walker maintains that the methods and formulas he employed are the ones generally accepted and utilized in the accident reconstruction profession, he does not explain how any of the research or tests he relied on support his conclusion.

■■■■■ It is far from clear how the detached wheel could "follow the vehicle" in the wheel well as it crossed the median. However, even more concerning in light of our jurisprudence is that Walker performed no tests and cited no publications to support his opinion that the wheel was traveling at a higher velocity than the Passat which, by principles of physics, kept the wheel in the wheel well. It is well established that an expert must show the connection between the data relied on and the opinion offered. *Gammill*, 972 S.W.2d at 726. An expert's bare opinion will not suffice. *Havner*, 953 S.W.2d at 711. "[I]t is not so simply because 'an

expert says it is so.'" *Gammill*, 972 S.W.2d at 726; *Havner*, 953 S.W.2d at 712 (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 421 (5th Cir.1987)). Here, Walker does not close the "analytical gap" by explaining how the Passat's wheel could behave as he described, especially in light of the fact that there are no other studies, publications, or peer review that support his position. The tucked or floating wheel theory that Walker offers is not supported by objective scientific analysis and is based solely upon his subjective interpretation of the facts. As such, Walker's opinion is unreliable and constitutes no evidence of causation.

## B. Videotaped Statement

■■■■ At trial, the jury reviewed a videotape of a local television news crew's interview of a man at the accident scene. The witness refused to give his name or allow his face to be shown on camera. During the interview, the witness stated, "The [Passat] was headed from here towards over there and apparently had a blown-out tire.... The tire blew up and it crossed the median and it hit the car that was headed from over there towards over here." Volkswagen claims these statements are hearsay not within any hearsay exception. Volkswagen further argues that the admission of the videotaped testimony constituted harmful error since the Ramirezes relied on it to prove the central theory of their case that something had gone wrong with the Passat's left rear wheel before the Passat crossed the median causing Sperling to lose control and collide with Guerra's Mustang.

by Volkswagen. He testified that he conducted lateral force, vertical force, and tire de-bead tests to determine the quantity of force necessary to remove the bead from the wheel's rim flange. Walker also reviewed the drag test conducted by Volkswagen's expert

concerning the marks that would be made on a wheel and tire dragged across grass and concrete. Walker does not explain how any of these tests establish when the wheel detached or how it remained tucked in the wheel well during the accident.

■ The Ramirezes claim that Volkswagen did not preserve its objections to the unidentified witness's statement on appeal. They contend that Volkswagen waived its objection to the videotaped statement because it did not object to the live testimony at trial of the television reporter who recounted her conversation with the unidentified witness at the accident scene. The general rule is error in the admission of testimony is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection. *Richardson v. Green,* 677 S.W.2d 497, 501 (Tex.1984); *City of Houston v. Riggins,* 568 S.W.2d 188, 190 (Tex.Civ.App.Tyler 1978, writ ref'd n.r.e.).

Volkswagen asserts that it had a running objection to all references to the unidentified witness's testimony. Specifically, before trial Volkswagen objected to "showing that videotape and object[ed] to any reference to any alleged witness and object[ed] to any reference to ... what he may or may not have seen out there." The trial court denied the objection but expressly recognized Volkswagen's running objection to the evidence. Because Volkswagen's initial objection to the evidence complied with Texas Rule of Appellate Procedure 33.1(a) and its requested running objection clearly identified the source and specific subject matter of the expected objectionable evidence prior to its disclosure to the jury, recognition of the running objection for more than one witness was appropriate.[4] *See Ethington v. State,* 819 S.W.2d 854, 858–59 (Tex.Crim. App.1991); *Bunnett/Smallwood & Co. v. Helton Oil Co.,* 577 S.W.2d 291, 295 (Tex.Civ.App.Amarillo 1978, no writ); *see Huckaby v. A.G. Perry & Son, Inc.,* 20 S.W.3d 194, 203 (Tex.App.Texarkana 2000, pet. denied) ("A running objection is re-

quired to be specific and unambiguous."). Volkswagen plainly identified the source of the objectionable testimony, the subject matter of the witness's testimony and the ways the testimony would be brought before the jury. Hence, the running objection preserved the complaint not only to the unidentified witness's testimony but also to the reporter's testimony concerning what the witness said.

The court of appeals held that the witness's statement did not constitute hearsay because the testimony was not offered for the truth of the witness's assertion that the "tire blew up." 79 S.W.3d at 122. Even if the statement constituted hearsay, the court of appeals reasoned that the trial court may have admitted it as an excited utterance. *Id.* The court of appeals also concluded that if the trial court committed error in admitting the videotape of the statement, the error was harmless because the admission did not result in an improper judgment. *Id.*

■ Hearsay is defined as an out-of-court statement offered in evidence to prove the truth of the matter asserted. Tex.R. Evid. 801(d). While the Ramirezes did not offer the videotaped statement of the unidentified witness to prove that the "tire blew up," they did offer it to support their theory that the Passat's left rear wheel separated from the car and caused Sperling's initial loss of control of the vehicle before it crossed the median. For example, in closing arguments, counsel for the Ramirezes told the jury the videotaped testimony "means that something obviously went wrong with this tire." We conclude that the videotaped testimony falls squarely within the definition of hearsay and therefore must meet one of the hearsay exceptions to be admissible. The court of appeals' narrow interpretation of

4. Rule 33.1(a) provides the general rules for preserving a complaint for appellate review.

the hearsay definition would allow circumvention of the safeguards that were created by the hearsay rules to guarantee the trustworthiness of out-of-court statements and prevent the unfair prejudice that could arise from their admission. The Ramirezes argue that the unidentified witness's statements were admissible under the excited utterance hearsay exception. We therefore consider that issue.[5]

To be admissible as an excited utterance, a statement must be 1) a spontaneous reaction 2) to a personal observance of 3) a startling event 4) made while the declarant was still under the stress of excitement caused by the event. Tex.R. Evid. 803(2); *Richardson*, 677 S.W.2d at 500; *Hartford Accident & Indem. Co. v. Hale*, 400 S.W.2d 310, 311 (Tex.1966). In his treatise on evidence, John Henry Wigmore articulated the rationale for the excited utterance exception to the exclusion of hearsay testimony from trial:

> [U]nder certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or at least as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just

observed by him; and may therefore be received as testimony to those facts.

6 Wigmore, Evidence in Trials at Common Law § 1747, at 195 (James H. Chadbourn rev.1976) (citations omitted). This general principle underlying the excited utterance exception has also been espoused by the United States Supreme Court and our sister court, the Texas Court of Criminal Appeals. *See Idaho v. Wright*, 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (noting that excited utterances "are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous."); *King v. State*, 631 S.W.2d 486, 491 (Tex. Crim.App.1982) (recognizing that a person's "capacity for reflection necessary to the fabrication of a falsehood is lost" when making a spontaneous exclamation).

For an exclamation to be spontaneously made while under the stress of excitement, it must occur before the declarant has the opportunity to reflect on or ponder the shocking incident. *White v. Illinois*, 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); *People v. Vasquez*, 88 N.Y.2d 461, 579 (1996). Accordingly, we also consider the lapse in time between the startling event and the statement to assist in determining whether a declarant made an excited utterance or a deliberative statement. *See Truck Ins. Exch. v. Michling*, 364 S.W.2d 172, 174 (Tex.1963) (noting that statements do not have to be strictly contemporaneous with the exciting cause because "there can be no definite and fixed limit of time. Each case must depend upon its own circum-

---

**5.** The proponent of hearsay has the burden of showing that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Skillern & Sons, Inc. v. Rosen*, 359 S.W.2d 298, 301 (Tex.1962).

stances." (quoting 6 Wigmore, Evidence in Trials at Common Law § 1750, at 221 (3d ed.1961))). Similarly, that a statement was made in response to questions is a factor to be considered although that fact alone may not render the statement inadmissible. *Lawton,* 913 S.W.2d at 553. The declarant's tone and tenor of voice are also weighed in determining whether a statement qualifies as an excited utterance. *United States v. Alexander,* 331 F.3d 116, 123 (D.C.Cir.2003).

In this case, the exact time that it took the news crew to reach the accident scene, set up their equipment, and interview the unidentified witness is not known. The evidence shows that some time had passed and the witness's statements were not made as the accident occurred or immediately after witnessing the accident. After the accident and once the news crew arrived at the accident scene, the reporter searched for people to interview about the accident. After the reporter located the unidentified witness, but before the witness would agree to talk to the reporter, the videotape shows that the witness took steps to ensure that his identity remained anonymous. During the interview, the witness was composed as he answered the reporter's questions and calmly related the events of the accident. These facts combined show that the witness had time to ponder the event to give considered testimony after the stress of the excitement of the accident had subsided.

The Ramirezes argue that the presence of emergency workers and the sounds of the "Jaws of Life" machine in the background, working to free the injured parties, are themselves ongoing startling events. While these ongoing events are capable of placing stress on a witness, that stress is different from the stress of excitement caused by observing the accident.

We conclude that the unidentified witness's account of the accident was not an excited utterance. The evidence indicates that the witness's statements were calmly given in response to the reporter's questions after an opportunity for deliberation, rather than made as a spontaneous reaction to the accident. They are therefore hearsay which should have been excluded by the trial court. The unidentified witness's testimony is no evidence of causation. *See Havner,* 953 S.W.2d at 711 (a no evidence point will be sustained when the court is barred by rules of law or evidence from giving weight to evidence offered to prove a vital fact).

### C. Edward Cox

Because Walker's testimony and the unidentified witness's statements cannot legally support the jury's finding of causation, we look to the remaining evidence in a light most favorable to the Ramirezes to determine whether it supports their theory that a defect in the Passat caused the collision between Sperling and Guerra. *See Kerr–McGee,* 133 S.W.3d at 254; *Havner,* 953 S.W.2d at 711. The only other evidence that the Ramirezes say supports causation is the testimony of Dr. Edward Cox. Therefore, we review his testimony and determine whether it is legally sufficient to prove causation.

But first we address a preliminary point. The dissenting justices complain that the legal sufficiency of Cox's testimony on causation was not presented as an issue to this Court. They contend that Volkswagen waived the issue. There are two brief responses. First, Volkswagen asserted as an issue in its petition that "the unsupported testimony of plaintiffs' accident reconstruction expert" is legally insufficient evidence of causation. On appeal, the Ramirezes relied almost exclusively on Walker's testimony to pro-

vide evidence of causation, but in their brief in this Court, the Ramirezes asserted that Cox also provided evidence of causation. It is not inappropriate or in violation of the rules of appellate procedure that Volkswagen addresses Cox's opinions for the first time in its reply to the Ramirezes' response. Second, the no evidence issue in the petition was not confined to Walker's testimony. It challenged the causation opinions of plaintiffs' accident reconstruction expert. If the Ramirezes decided to rely on Cox, in addition to Walker, for such causation opinions, the issue fairly includes both experts. *See* TEX.R.APP.P. 53.2(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.").

Cox was the Ramirezes' metallurgical expert at trial who was offered to prove that a defect in a metal bearing caused the left rear wheel assembly to separate from the axle. He was not offered as an accident reconstructionist to help establish when the defect manifested itself or that the defect caused the accident, but he did offer some limited opinions on the causation issue. Although Volkswagen does not dispute the reliability of Cox's testimony regarding the existence of a defect as it did at the trial court and court of appeals, Volkswagen does contend that Cox's testimony is no evidence to support causation. Further, Volkswagen contends that, as with Walker, Cox does not explain how the left rear wheel remained floating directly underneath the stub axle, from which it had allegedly detached, through the accident sequence.

In *Coastal Transport Co. v. Crown Central Petroleum Corp.*, we further clarified the distinction between no evidence challenges to the reliability of expert testimony in which we evaluate the underlying methodology, technique or foundational

data used by the expert and no evidence challenges to conclusory or speculative testimony that is non-probative on its face. 136 S.W.3d 227, 233 (Tex.2004); *see also Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 412 (Tex.1998) (distinguishing between challenges to scientific reliability and no evidence challenges "where, on the face of the record, the evidence lacked probative value").

The dissent pronounces that this application of *Coastal Transport* "sets a dangerous precedent" because, in essence, the expert testimony in this case is too lengthy to be evaluated for its conclusory or speculative nature. 159 S.W.3d at 917 (The dissent asserts that the testimony at issue in *Coastal Transport* was "paltry" by comparison.). The Court does not agree. *Coastal Transport* and this decision are consistent with precedent. In *Schaefer v. Texas Employers' Insurance Ass'n*, we reviewed the entire record (a substantial one at that) of a medical expert's testimony at trial and concluded that his opinion on causation was based on mere possibility, speculation and surmise. 612 S.W.2d 199, 204 (Tex.1980). The physician had opined based on reasonable medical probability that a worker's disease resulted from his employment as a plumber and his exposure to soil contaminated with bird feces. *Id.* at 202–03. In that no evidence challenge, we held that the opinion constituted no evidence of causation. *Id.* The dissent here makes arguments that the dissent made in *Schaefer*. The Court has now rejected those arguments at least twice. *See Schaefer*, 612 S.W.2d at 204–05.

We further addressed this situation in *Havner*:

It reduces the no evidence standard of review to a meaningless exercise of looking to see only what words appear in the transcript of the testimony, not whether there is in fact some evidence. We have

rejected such an approach. *See Schaefer*, 612 S.W.2d at 205; *see also Burroughs Wellcome*, 907 S.W.2d at 499–500. 953 S.W.2d at 712.

■ Since Volkswagen does not object to the reliability of Cox's testimony, we limit our review of this evidence to the face of the record. We must determine whether more than a scintilla of evidence exists to raise a fact issue on the question of causation. *Coastal Transp.*, 136 S.W.3d at 233–34; *Havner*, 953 S.W.2d at 711. More than a scintilla of evidence exists when the evidence supporting the jury's finding "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Coastal Transp.*, 136 S.W.3d at 234 (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994)); *accord Havner*, 953 S.W.2d at 711.

Cox's causation testimony is that a "sudden and abrupt catastrophic event" inside the Passat's left rear wheel bearing assembly set in motion a series of other events that eventually led to the wheel separating from the car and moving outwards along the stub axle. According to Cox, this would be consistent with unusual and "erratic vehicle behavior which would then cause the driver to make a corrective steer" into the median. Cox stated that the bearing failure "ha[d] to happen" before the vehicle entered the median because that was the only opportunity for several pieces of grass from the median to get into grease inside the wheel's hub.

There are several concerns raised by reliance on Cox's testimony as evidence of causation. Cox's testimony that the results of this defect would be consistent with erratic vehicle behavior causing the driver to make a corrective steer and veer into the median is an unsupported conclusion. Cox does not point to any data that proves it is more probable than not that

Sperling did in fact experience unusual behavior in the Passat, which then caused her to veer across the median and collide with Guerra's Mustang. He cites no testimony, tests, skid marks, or other physical evidence to support this opinion. Notably, Cox emphasizes that the determination of when the vehicle's "unusual behavior" occurs is "Mr. Walker's analysis." Cox further undermines the basis for his opinions when he acknowledged, "I haven't been involved in the accident reconstruction." *See Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex.1999) (focusing the review of expert opinion testimony on "the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone").

In addition, Cox's limited opinion on causation is based on finding grass in the wheel hub. His opinion is just as consistent with the wheel coming off in the median after the Passat went out of control as it is with a wheel separation prior to entering the median.

Finally, as with Walker, Cox's testimony fails to answer a crucial question raised by the Ramirezes's theory of causation—how the floating wheel stayed in the wheel well as the Passat traveled through the median and collided with the Mustang. Walker opined that the collision between the Passat and the Mustang occurred at a closing speed of over 100 miles per hour and caused the Passat's rear end to jerk to the left before coming to rest with the left rear wheel laying directly under the left rear stub axle. Failure to explain how the "tucked" wheel stayed in the wheel well is, by itself, near fatal to the Ramirezes' opinions on causation. Accordingly, Cox's opinions of the cause of the accident are conclusory on their face and are therefore no more than a mere scintilla of evidence.

The dissent disagrees and would hold that Cox's testimony is some evidence of

proximate cause. The dissent cites Cox's testimony at length, but the bulk of the testimony relied on concerns Cox's opinions on the existence of a defect, and not causation. To the extent that Cox's opinions address the proximate cause of the accident, they merely raise a suspicion or surmise of the cause of the accident and fall short of the burden of proving causation.

■ Certainly in a no-evidence review we indulge all reasonable inferences in favor of the jury's verdict, as we have done here. *Havner*, 953 S.W.2d at 711. We are not required, however, to ignore fatal gaps in an expert's analysis or assertions that are simply incorrect. While juries are important to our legal system, they cannot credit as some evidence expert opinions that are not reliable or are conclusory on their face. These principles. are consistent with a legal sufficiency review. *See Havner*, 953 S.W.2d at 711–12; *Schaefer*, 612 S.W.2d at 204–05.

### III. Conclusion

We hold that the expert testimony of Ronald Walker and the videotaped statement of the unidentified witness are inadmissible under the rules of evidence. Edward Cox does not supply legally sufficient evidence that the alleged defect in the left rear wheel assembly caused the accident. Consequently, there is no evidence to sustain a finding that the alleged defect proximately caused the accident. We therefore reverse the judgment of the court of appeals and render a take-nothing judgment in favor of Volkswagen.

Justice HECHT filed a concurring opinion, in which Justice OWEN joined.

Justice HECHT, joined by Justice OWEN, concurring.

I join fully in the Court's opinion and add only a brief additional response to the dissent.

In essence, Dr. Edward Cox, who testified as an expert for the plaintiffs, established the following facts: he has a doctorate in theoretical and applied mechanics; he has extensive experience in metallurgy; he owns an electron microscope; and he has used that microscope to examine a wheel bearing on the decedent's vehicle. He then testified that, based on his credentials, his experience, and the tools available to him, the bearing was defective because (1) the adjustment nut was too loose, (2) the car had been cinched down too tightly when it was originally transported for sale, and (3) there were temperature inconsistencies in the manufacturing process. These defects, Dr. Cox concluded, show that bearing failure did not result from the accident, but caused it. In the dissent's view, Dr. Cox's opinion about what happened is some evidence that it actually did happen.[1]

It is not. There is in the evidentiary record one thing, and only one, to connect microscopic thread tearings with loose nuts, false brinell marks on rollers in a bearing assembly with tight cinching in transit, and metal fragments with temperature inconsistencies in the manufacturing process in other words, to connect Dr. Cox's observations with his conclusions— and that is: Dr. Cox's say-so. Whether his conclusions were valid cannot, on this record, be measured by objective tests that actually associate microscopic conditions with producing causes, or by statistical correlations between such conditions and bearing failures, or by analyses in the professional literature of the science of

---

1. Post at 918.

metallurgy. We have no such evidence. On this record, whether Dr. Cox's conclusions were valid can be measured by one thing, and one thing only: his personal credibility.

Personal credibility may well be a determining factor in assessing the testimony of a fact witness, but we require more of an expert witness, lest a very convincing charlatan in a lab jacket pull the wool over laymen's eyes. We have reiterated that "a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness."[2] It is not enough that an expert seem credible. An expert must show that his views have the support of established, objective observations or a well-considered consensus of at least a substantial segment of the scientific, technical, or specialized community to which he belongs. Dr. Cox did neither.

The dissenting Justices would surely never allow me to testify that I have degrees from distinguished universities, that I have long been interested in aberrant behavior, that I have access to an electron microscope, that I have studied the dissenting Justices' DNA, and that they are, sad truth to tell, extraterrestrials. Even if all of the premises were true (some are not), my colleagues in dissent would have a powerful argument that the only bridge between my credentials, experience, and observations on one side, and my opinions on the other, is my own veracity, which is not enough. Such opinions cannot rest on mere belief convincingly expressed. They provide no support for a proposition over which other experts like myself may disagree, leaving the matter for a jury to decide. Such opinions are no legal evidence at all.

Thus, the dissent is simply wrong when it argues that to disregard Dr. Cox's opinions is to reweigh the evidence. One cannot reweigh evidence that weighs zero. Dr. Cox's opinions rested solely on his own credence. I do not mean for a moment to disparage his credentials, experience, or observations. But the integrity of metallurgical science requires that the assertions of one person, however qualified and experienced, be based in the science itself. The ultimate opinions Dr. Cox expressed in this case are precisely the sort of conclusory opinions that are not legal evidence to support a claim.

Chief Justice JEFFERSON filed a dissenting opinion, in which Justice O'NEILL joined.

Chief Justice JEFFERSON, joined by Justice O'NEILL, dissenting.

The Court concludes that Cox's testimony amounts to "no more than a mere scintilla" of evidence on causation. 159 S.W.3d at 911. To the contrary, Cox testified that the Passat experienced a "catastrophic failure of the wheel bearing assembly" while it was traveling in the eastbound lane of U.S. Highway 83, *before* the Passat entered the median. He both tested and rejected Volkswagen's alternative theory— that damage to the wheel bearing assembly occurred *after* the Passat's collision with the Mustang. Reasonable jurors could have accepted Volkswagen's theory and rejected Cox's (as they did in the first trial), or accepted Cox's and rejected Volkswagen's (as they did here), but unlike the jury, this Court lacks constitutional

---

2. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex.2004); *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999) (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726–727 (Tex. 1998) (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508, (1997)); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711–712 (Tex.1997); *Schaefer v. Texas Employers' Ins. Ass'n*, 612 S.W.2d 199, 202–204 (Tex.1980)).

authority to weigh conflicting evidence. Accordingly, I respectfully dissent from the Court's rendition of judgment for Volkswagen.

I agree with the Court, however, that the trial court erred in admitting the testimony of the unidentified witness, whose deliberate steps to ensure his anonymity and calm demeanor throughout the interview negate the trial court's conclusion that this hearsay was admissible under the excited utterance exception. Furthermore, that error probably caused the rendition of an improper judgment. I would accordingly reverse the court of appeals' judgment and remand the case to the trial court for a new trial.

# I

## Cox's Testimony on Causation[1]

Causation was a hotly contested issue at trial. The Ramirez plaintiffs argued that a defective left-rear wheel bearing assembly caused Sperling to lose control of her Passat, which crossed the median and collided with Guerra's Mustang. In contrast, Volkswagen contended that driver error, specifically Sperling's overreaction to the contact between her Passat and the Camaro, triggered a chain of events that caused Sperling to lose control and cross the median. To that end, Volkswagen asserted that the left-rear wheel separation was not the cause of the accident, but the result of

the impact at the end of the accident sequence. Each party offered expert witness testimony to support their respective causation theories.

Cox testified that defects in the Passat's left-rear wheel bearing assembly caused an abrupt, catastrophic bearing failure that occurred from the inside out when the car was traveling in the eastbound lane of U.S. Highway 83. He asserted that cracks in the bearing assembly produced metal fragments that eventually became lodged within the assembly, causing it to jam and disintegrate abruptly. He contended that as the bearing assembly came apart, pieces of it were ejected with force sufficient to knock off the thrust washer and adjusting nut that held the wheel assembly intact. Without the adjusting nut in place, the hub and rotor moved outward until the rotor contacted the brake pads and induced a retarding force, which led to erratic vehicle behavior and caused Sperling's vehicle to enter the median.

Cox specifically testified regarding three vehicle defects. First, based on microscopic tearing at the base of the threads in the adjustment nut, which holds the bearing assembly intact, he contended that the nut was looser than it should have been. Second, based on false brinell marks on the rollers within the bearing assembly, he concluded that the bearing assembly was damaged in transit because the car was cinched down too tightly.

---

1. Texas Rule of Appellate Procedure 53.2(f) states: "The petition must state concisely all issues or points presented for review. The statement of an issue or point will be treated as covering every subsidiary question that is fairly included." *See also* Tex.R.App. P. 55.2 (brief on merits must be confined to issues stated in petition for review). Volkswagen, in petitioning this court for review, did not complain that Cox's testimony on causation was legally insufficient. The issue presented in Volkswagen's petition for review was not briefed and referred to Walker, not Cox:

"Was the unsupported testimony of the plaintiffs' *accident reconstruction expert*. [Walker] legally sufficient evidence of causation?" (Emphasis added.) Volkswagen first challenged Cox on causation in its reply brief on the merits and then devoted only two sentences suggesting, inaccurately, that Cox did not testify about when the bearing failed or whether it could have contributed to the accident. Given this procedural background, the Court has essentially concluded that Rules 53.2(f) and 55.2, although stated as mandates, are merely aspirational.

Third, based on the presence of cracking and metal fragments in the bearing assembly, Cox concluded that the metal in the assembly became embrittled by temperature inconsistencies in the manufacturing process. He testified that the embrittled material structure led to cracks, which created steel bearing fragments that were found embedded in the roller cage of the Passat, trapped between the inner and outer races and embedded in the surface of the rollers.

The Court concludes that "Cox's testimony that the results of this defect would be consistent with erratic vehicle behavior causing the driver to make a corrective steer and veer into the median is an unsupported conclusion." 159 S.W.3d at 912. I submit, however, that the jury was entitled to make the reasonable inference that the wheel bearing assembly's disintegration (which all agree would cause erratic vehicle behavior) was the catalyst for the accident. Cox testified:

Q: And in that failure that occurs back here 500 feet or so, that's when this explosion takes place when the roller fragment ... comes shooting out and does what it has to do, correct?

A: I can't tell you the number of feet. I haven't been involved in the accident reconstruction. But I can tell you, you do have a catastrophic failure of the bearing which does, at that point, take the nut off which holds the wheel intact and which then causes the hub to start moving outward. And as the hub and rotor move outward, the rotor contacts the brake pads, which would then induce a retarding force because of contact between the rotor and the brake pads, which would certainly be consistent with why there is an unusual behavior of the vehicle at that point in time. Now, where it occurs in the highway, I can't tell you. That's Mr. Walker's analysis.

But we do know that those facts of the failed fastener assembly and the friction between the rotor and the brake pads would certainly lead to an erratic vehicle behavior which would then cause the driver to make a corrective steer.

The Court states that Cox cited "no testimony, tests, skid marks, or other physical evidence to support []his opinion." 159 S.W.3d at 912. In fact, as the Court itself notes, Cox testified on direct examination that the presence of grass mixed with the grease in the hub could be explained only if the bearing failure occurred before the vehicle went into the median. *Id.* at 912. Volkswagen itself elicited similar testimony:

Q: I don't know if you were present in the courtroom when I was talking with Mr. Walker, but we were looking at this diagram that Mr. Walker brought in where we see the beginning of the marks here that the police had indicated. We talked about the car leaving the eastbound lanes and going in the median, and I had a dialogue with Mr. Walker about the fact that the failure had to occur back 528 feet or 564 feet from the point at which the Passat enters the median. Were you present for that discussion?

A: Yes, I was.

. . . .

Q: Okay. In other words, back here in your opinion and his opinion, there was this sudden catastrophic failure of the wheel bearing assembly, correct?

A: Sure. It has to happen before the vehicle goes into the median because we know from the grass in the hub that's your only opportunity to get the grass there.

Furthermore, Cox testified regarding additional physical evidence of a bearing failure that occurred from the inside out prior

to impact (contrary to Volkswagen's assertions):

> Q: Now, go ahead and tell me about the time elements with the different parts now that we know what those parts are, if you would.
>
> A: Okay. We know from the physical evidence that there are small fragments in the bearing that have been run over by the rollers. Those fragments were being generated by the bearing before it failed. . . .
>
> We have in this instance literally friction welded a piece of debris onto rollers and pieces of the inner race. So before everything comes apart, we have a bearing that's starting to disintegrate. It's malfunctioning, which also is consistent with the grease becoming black, because grease normally does not discolor in such a short time period. . . .
>
> But yet the grease inside the cavity of the hub was coal black, the bearings, and contained lots of these little fragments.
>
> That was part of what led up to the failure. But we also had some damage in the bearings that preexisted much of the operation life. What happened—
>
> . . . .
>
> Q: What made those [brake pad] markings?
>
> A: There's only one thing that could make those marks, and that's from this rotor, the edge of this rotor. The brake is clamped. And, again, it's undisputed that the parking brake was activated when the Volkswagen crashed frontally into the Mustang. So the brakes were activated at that time, and this shows us the position of this rotor at that point in time.
>
> . . . .

> Q: So this is the brake pad only hitting the edge of the rotor because the rotor is off center?
>
> A: Right, when the brake is activated. And there's only one point in time when the brake is activated, and that's at the point of the frontal collision. So that tells us definitively that we have a broken rotor at the time of impact.
>
> Q: Does it tell you whether or not the failure occurred before or after the time of impact?
>
> A: Yes.
>
> Q: Conclusively?
>
> A: Yes.
>
> Q: And what does it tell you?
>
> A: It tells you that at the time that the two vehicles collided, the wheel was already broken away.
>
> . . . .
>
> Q: Is this a failure inside-out or outside forces in?
>
> A: This is an internal failure where the bearing itself is starting to digest itself.
>
> Q: Is the wheel moving when this is happening?
>
> A: Sure. Because if the wheel is not moving, the rollers aren't going around the race, and so the rollers can't roll over anything. So this has to be a rotational event.
>
> Q: Does it happen before or after the vehicles collide together?
>
> A: It has to occur before.

While Cox's causation testimony is neither ironclad nor exhaustive, it is surely *some* evidence that the Passat's bearing failure occurred in the eastbound lane, contributed to Sperling's loss of control, and ultimately caused a catastrophic accident in the westbound lane.[2] Whether the

---

**2.** The jury answered "yes" to this question: "Was there a defect in the Volkswagen Passat stationwagon at the time it left the possession of Volkswagen of America, Inc., that was a

wheel separated completely in the eastbound or westbound lanes is important but not dispositive; indeed, the jury could have accepted Volkswagen's theory that a total separation occurred toward the end of the accident sequence, yet also accepted Cox's testimony that the bearing failure began a process in which the hub *began* moving outward and *eventually* resulted in a total wheel separation in the median (which explains grass in the wheel hub), immediately before the collision in the westbound lane. We are supposed to indulge inferences in *favor* of the verdict, not *against* it.

*Coastal Transport Co. v. Crown Central Petroleum Corp.*, 136 S.W.3d 227, 231 (Tex.2004), does not support the result the Court reaches today. In that case, we concluded that an expert's testimony on gross negligence was conclusory on its face. *Id.* at 233. The sum total of testimony on gross negligence in *Coastal* was as follows:

> Q: When viewed objectively from Coastal's point of view at the time of the September '93 incident, in your opinion, did Coastal's failure to stop using probes that could have [sensor failure] problems, did that involve a high degree of

risk, considering the probability and magnitude of the potential harm to others?

A: Yes, it did, very high.

Q: In your opinion, did Coastal have an actual subjective awareness of the risk involved in failing to stop using probes that can have [sensor failure] problems?

A: Yes, again and again.

Q: And in your opinion, did Coastal nevertheless proceed with conscious indifference to the rights, safety, or welfare of others?

A: That's the only conclusion I can draw.

*Id.* at 231. By equating Cox's testimony here with the paltry testimony at issue in *Coastal*, the Court sets a dangerous precedent that threatens to fundamentally alter the nature of no-evidence review.[3]

Rather than indulging every reasonable inference in favor of the jury's finding, the Court adopts a contrary approach, tipping the scale in the opposite direction to dismiss as "conclusory" expert testimony that supports the verdict. This Court is constitutionally bound to conduct only a legal—not factual—sufficiency review.[4] *See* Tex.

---

3. Justice Hecht's colorful concurrence misses the point. Volkswagen has not challenged in this Court the methodology employed by Cox or the extent to which his conclusions are supported by testing, which form the bulk of Justice Hecht's concurrence. Cox does not say "the moon is made of green cheese," or "the Earth is the center of the solar system," but rather that objective evidence supports his conclusion that the bearing failure occurred before the Passat left the eastbound lane and caused the accident. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 420 (Tex.1998) (Hecht, J., concurring). A court may decide as a matter of law that the former examples are "no evidence," but when more than a scintilla of objective evidence supports an ex-

producing cause of the occurrence in question?"

pert's conclusions in a technical area in which judges have no particular expertise, and when that expert's methodology is not challenged on appeal, the question becomes one of factual, and not legal, sufficiency.

4. Whether the evidence is sufficient, as a *factual* matter, to support the jury's finding is beyond this Court's jurisdiction. This is not to deny the trial court's obligation, as gatekeeper, to assess reliability during the *Daubert–Robinson* hearing, *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex.1995), nor the appellate court's obligation to evaluate the trial court's determination when a party challenges reliability on appeal. But here, as the Court notes, "Volkswagen does not object to the

Const. art. V, § 6; Tex. Gov't Code § 22.225(a); *Herbert v. Herbert*, 754 S.W.2d 141, 143 (Tex.1988); *Hall v. Villarreal Dev. Corp.*, 522 S.W.2d 195 (Tex.1975). While a jury or court of appeals may find Cox's testimony *factually* insufficient on causation, it is at least *some evidence*. I therefore respectfully dissent from the Court's rendition of judgment for Volkswagen.

## II

### Unidentified Witness's Testimony

The trial court admitted into evidence an unidentified eyewitness's assertions that the Passat had a blown-out tire before it crossed the median. I agree with section IIB of the Court's opinion, which concludes that the witness's statements were not an excited utterance and thus, were inadmissible hearsay. The videotaped testimony reveals that the witness's first reaction was one of self-interest; he agreed to the interview only if his identity was concealed. He was composed and reflective when giving his statement. I therefore agree that the statement does not qualify as an excited utterance.

I write separately to address whether the trial court's erroneous admission of the witness's testimony amounted to harmful error requiring reversal.

### A

### Standard of Review

Whether to include or exclude evidence is a matter committed to the trial court's sound discretion. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex.2001); *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex.2000). "Erroneous admission of evidence requires reversal only if the error probably (though not necessarily) resulted in [the rendition of] an improper judgment." *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex.2004); *see also* Tex.R.App. P. 61.1(a); *Interstate*, 66 S.W.3d at 220. To make this determination, we review the entire record. *Nissan*, 145 S.W.3d at 144; *Able*, 35 S.W.3d at 617; *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex.1995). We will not reverse a judgment for erroneous rulings if, as the plaintiffs argue here, the evidence in question is cumulative. *Interstate*, 66 S.W.3d at 220; *Able*, 35 S.W.3d at 617–18.

While it is clear that a judgment should not be reversed for erroneous admission of evidence that is merely cumulative, beyond that, determining whether the erroneous admission was harmful "is more a matter of judgment than precise measurement." *Nissan*, 145 S.W.3d at 144; *see also Interstate*, 66 S.W.3d at 220; *Able*, 35 S.W.3d at 617. To make this judgment, we have looked to counsel's efforts to emphasize the evidence in question. *See Nissan*, 145 S.W.3d at 144; *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 883–84 (Tex.2003); *Alvarado v. Farah Mfg. Co., Inc.*, 830 S.W.2d 911, 917 (Tex.1992). In addition, we have examined whether there was contrary evidence that the improperly admitted evidence was calculated to overcome. *See Nissan*, 145 S.W.3d at 144; *Spohn Hosp.*, 104 S.W.3d at 884.

### B

### Harmful Error Analysis

As noted above, the parties vigorously disputed causation in this case. Whereas the plaintiffs contended that a defective

---

reliability of Cox's testimony." 159 S.W.3d at 912. Our limited task, then, is to determine whether the evidence is legally sufficient.

bearing assembly led to a catastrophic bearing failure that caused the accident, Volkswagen argued that driver error caused the accident and that the bearing failure was the result, not the cause, of the accident. The main dispute at trial centered around whether the bearing failure occurred in the eastbound lanes, thereby causing the Passat to enter the median and collide with the Mustang, or in the westbound lanes, as a result of the impact at the end of the accident sequence.

The trial court admitted into evidence a local news crew's videotaped interview of a witness at the accident scene. In the interview, the witness stated: "The station wagon was headed from here toward over there and apparently had a blown-out tire. . . . The tire blew up and it crossed the median and it hit the car that was headed from over there toward over here." The witness refused to identify himself and was never located or deposed. The court of appeals held that, if the trial court committed error in admitting the witness's testimony, the error was harmless because the appellant did not show that the error probably resulted in an improper judgment. 79 S.W.3d at 122. I disagree.

The unidentified witness's testimony was not merely cumulative of other evidence in this case. The witness's statements constituted the *only* disinterested, eyewitness account that the plaintiffs offered to support their causation theory—that the bearing failure occurred at the beginning of the accident sequence, thereby leading Sperling to lose control of the Passat, which crossed the median and collided with the Mustang. Although Cox also provided some evidence of causation, his testimony was derived not from direct observation of the accident, but from post-accident analysis and testing. Moreover, unlike the unidentified witness, Cox conducted his research and formed his opinion solely for

the purpose of litigating this case. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 559 (Tex.1995) ("[O]pinions formed solely for the purpose of testifying are more likely to be biased toward a particular result."); *Nissan*, 145 S.W.3d at 144 (noting that "we have consistently required competent expert testimony and objective proof" in product defect cases). Finally, whereas Volkswagen was able to challenge the credibility of Cox's testimony through cross-examination, it did not have the same opportunity with the unidentified witness. *See Davidson v. Great Nat'l Life Ins. Co.*, 737 S.W.2d 312, 314 (Tex.1987) ("Cross-examination is a safeguard essential to a fair trial and a cornerstone in the quest for truth."); *State v. Hilton*, 412 S.W.2d 41, 42–43 (Tex.1967) (holding that error in denying cross-examination of witness was harmful because witness was "the real supporting witness").

At trial, Plaintiffs' counsel repeatedly emphasized the importance of this evidence. Counsel presented the evidence in three forms: (i) the videotaped interview of the witness at the scene of the accident; (ii) a transcript of the interview read to the jury; and (iii) live testimony of the reporter who interviewed the unidentified eyewitness. In arguing for the admission of the evidence, counsel asserted that the videotape containing the interview was "a *very important piece of evidence* for the plaintiffs" and that they were "only going to show the video clips of the evidence that [they] *need[ed] to prove their case.*" (Emphasis added.) They referred to the evidence in their opening statement, and it was the first evidence presented at trial. Most notably, plaintiffs' counsel made the following statements during closing argument:

We heard from an eyewitness, an eyewitness who gave some testimony, testi-

mony that hasn't been controverted, hasn't been disputed in this case, hasn't even been addressed. It's just kind of been ignored by Volkswagen. And what did that man say? That man told us very clearly, very simply and very honestly ... that what he saw from his position looked like a blowout to him; that a tire blew out, a car went out of control, it skidded across a median, it killed two girls and permanently damaged another one. He has no ax to grind. He has no beef with anybody. He's not being paid to say any of this. He's just an honest man giving an opinion, an opinion that was captured on film and was given to you just minutes, minutes after he experienced it.

It wasn't like he went back out to the scene to measure. It wasn't like he looked at a bunch of photographs. It wasn't like he ran hundreds of tests and lots of exhibits. He told you that just minutes after he witnessed what he thought was a blowout.

What does that mean to us? It means something very, very, very clearly. It means that something obviously went wrong with this tire. This man didn't get to see an accident that took place in two seconds stopped frame by frame. What he saw was something come loose, and that's exactly what Mr. Walker told you.....

Additionally, the unidentified witness's testimony was very likely calculated to overcome contradictory evidence. To support its causation theory and discount the opposing theory, Volkswagen, like the plaintiffs, offered extensive expert witness testimony through an accident reconstructionist and metallurgist. It also presented an eyewitness who testified that the car appeared to be bouncing as it crossed the median and that its back end lifted off of the ground upon impact with the Mustang.

Finally, the sergeant who investigated the accident testified that the inspection indicated, albeit not definitively, that the Passat left four tire marks in the median and westbound lanes.

In sum, the evidence in question was not merely cumulative, it was heavily emphasized by the Ramirez's counsel, and it was very likely calculated to overcome contradictory evidence at trial. Considering these factors, I would hold that its erroneous admission was harmful and therefore necessitates reversal.

### III

### Conclusion

Cox's testimony is legally sufficient to support the jury's causation finding. I would not affirm the court of appeals' judgment on this ground, however, because the erroneous admission of the unidentified witness's statements probably resulted in the rendition of an improper judgment. Accordingly, I would reverse the court of appeals' judgment and remand the case to the trial court for a new trial. *See* Tex.R.App. P. 60.2(d).