# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00751-CV

**Gary Moyer, Appellant**

**v.**

**Marsha Ann Moyer, Appellee**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT NO. 00-15120-FC2-277, HONORABLE DERWOOD JOHNSON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

This appeal arises from a judgment of divorce in which actual and exemplary damages were awarded on a jury verdict finding intentional infliction of emotional distress. Appellant Gary Moyer asserts eleven issues he categorizes as (1) errors relating to the jury charge, (2) evidentiary errors, (3) errors regarding the damages awarded, and (4) errors regarding the admission of certain testimony from two expert witnesses. We will affirm the judgment.

## BACKGROUND

Gary and Marsha Moyer were married on April 20, 1991. The jury heard evidence that, only seventeen days after their wedding, Gary physically beat and verbally abused Marsha, grabbed her by the hair, choked her, shoved her into a wall, and smothered her face with his hand

until she was unconscious. Following this incident, Marsha filed for divorce alleging domestic violence, but the couple later reconciled and she dismissed the action.

Marsha testified about later incidents in which Gary punched, kicked, choked, or raped her, and banged her face and head into walls. She was later found to have a deviated septum and a damaged tear duct that causes her eye to water, which she attributes to Gary's physical abuse. Marsha also recounted verbal abuse, stating that Gary would call her obscene names, crazy, worthless, or stupid, and terrorize her with threats to kill her, suggesting that no one would hear a gunshot coming from their rural residence near Florence.[1] Dr. Alaire Lowry testified that Marsha lived in "abject terror" of Gary. Other witnesses—including a friend of Marsha with whom she sought refuge several times, her daughter, and her former husband—recounted seeing bruises and other signs of abuse.

Marsha left Gary after an August 6, 2000, incident in which she testified that "[m]y husband tried to kill me." After seeking help from a longtime friend, she went to authorities and filed a domestic violence report.[2] Both her friend and the interviewing officer testified that Marsha had swelling in her face and redness or scratches on her neck.

Two days later, Marsha filed for divorce. She later amended her petition to allege a claim for intentional infliction of emotional distress. *See Twyman v. Twyman*, 855 S.W.2d 619, 622

---

[1] During another episode, Marsha recounted that, after pushing her to the floor, Gary stood over her screaming "I want to see you cry" and claiming that "the problem with the world today is there's just not enough pain."

[2] Gary was ultimately convicted of misdemeanor assault related to this episode and placed on probation. *See Moyer v. State*, No. 03-02-00459-CR, 2003 Tex. App. LEXIS 4713, at *32 (Tex. App.—Austin June 5, 2003, pet. ref'd) (mem. op.).

(Tex. 1993).  Marsha also asserted defenses to the enforcement of a premarital agreement and an alter ego claim seeking to recover from Paper Resources International, Inc., a corporation that Gary had started in 1987.

The district court submitted to the jury: (1) whether grounds for divorce existed on the basis of cruel treatment by either Gary or Marsha against the other, *see* Tex. Fam. Code Ann. § 6.002 (West 1998); (2) whether the parties had entered into the premarital agreement that Gary had sought to enforce, *see id*. §§ 4.002-.006; (3) Marsha's alter ego claim against the corporation; and (4) liability, actual damages, and punitive damages under Marsha's intentional infliction of emotional distress claim.  Following the verdict and before judgment, the original verdict was lost; the district court, however, determined that the jury:  (1) found, as the sole ground for divorce, "Cruel treatment by Gary Moyer against Marsha Ann Moyer"; (2) found in Gary's favor on the premarital agreement and alter ego issues; (3) found that Gary had intentionally inflicted severe emotional distress on Marsha; (4) awarded a total of $908,000 in actual damages on the intentional infliction claim, including $68,000 for past and future medical care, $170,000 for past physical pain, $120,000 for past lost earning capacity, $210,000 for future lost earning capacity, $240,000 for past severe emotional distress, and $100,000 for future severe emotional distress; and (5) found that Gary had acted with malice and awarded $875,000 as punitive damages.  The district court rendered judgment in accordance with this verdict.[3]

This appeal ensued.

---

[3]  Although Marsha obtained a jury finding that she incurred $200,000 in reasonable and necessary attorney's fees, the district court was apparently concerned about a double recovery and declined to award her attorney's fees.  That decision was not appealed.

## DISCUSSION

Gary does not appeal the judgment of divorce or property division, but focuses solely on Marsha's "claims for damages on her claim for intentional infliction of emotional distress." He brings eleven issues, which can be grouped into issues concerning the (1) loss of the original jury charge, (2) content of the jury charge, (3) damages awarded, and (4) admission of certain testimony from two expert witnesses.

**Issues concerning the loss of the original charge**

In his first two issues, Gary seeks a new trial due to the loss of the original verdict. A week prior to the hearing on entry of judgment, the parties were informed that the jury's original verdict had been lost. At the hearing, one of Marsha's attorneys presented the court with a copy of the charge containing handwritten answers reflecting what was represented to have been the jury's answers. This conformed copy of the charge was introduced into evidence as Hearing Exhibit 1. Marsha's attorney emphasized that the answers to each numbered question corresponded to the answers the presiding juror had announced on the record when returning the jury's verdict.

After further discussion, the judge left the bench and returned with twelve copies of the charge that had been distributed to each juror at trial. Many of these copies had the jurors' names and answers written on them. The court introduced these copies into evidence as Hearing Exhibit 2. Gary objected to the court's consideration of these exhibits as a basis for judgment, urging that the rules of civil procedure required the original verdict to be "spread upon the minutes of the Court" and made a part of the record, with apparent reference to Rule 293 of the Texas Rules of Civil Procedure. *See* Tex. R. Civ. P. 293. The district court overruled the objection and proceeded to

4

render judgment on the verdict as reflected "[i]n lieu of the original, a conformed copy of [t]he questions submitted to the jury and the jury's findings," which the court attached and incorporated by reference.

On appeal, Gary does not assert that the conformed charge inaccurately reflects either the original charge or the jury's answers. He complains, rather, that the district court violated various procedural requirements and eliminated any means of objectively verifying from the record that the conformed charge accurately reflects the original charge and verdict.

In his first issue, Gary argues that the district court committed reversible error by failing to read the jury charge in its entirety when charging the jury. As Gary observes, Texas Rule of Civil Procedure 275 states that "[b]efore the argument is begun, the trial court shall read the charge to the jury in the precise words in which it was written, including all questions, definitions, and instructions which the court may give." Tex. R. Civ. P. 275. Here, after the charge conference, the jury returned to the courtroom and the court explained that it was "going to read portions of this charge." The court proceeded to omit a series of definitions and the individual issues. Gary urges that because the district court did not read the entire charge, there was no means in the record of verifying that the conformed charge accurately reflected the original charge and answers. He points out that, when announcing the jury's verdict, the presiding juror identified each question solely by its number, without reading the question or otherwise elaborating on its content. However, Gary waived any complaint under rule 275 by failing to object when the district court announced its intention to read only portions of the charge. *See* Tex. R. App. P. 33.1(a). Moreover, when the issue of the missing original verdict was discussed at the hearing on entry of judgment, Gary's counsel

5

acknowledged that "we waived the reading of the charge" because of its length. We overrule Gary's first issue.

In his second issue, Gary complains that the district court erred in rendering judgment based on the conformed charge.[4] We conclude that the district court did not act improperly, *see* Tex. R. App. P. 34.5(e); Tex. R. Civ. P. 77, and that, in any event, Gary has failed to demonstrate harm. *See Gravely v. Kirkland*, No. 09-98-282-CV, 1999 Tex. App. LEXIS 5277, at *2-3 (Tex. App.—Beaumont July 15, 1999, pet. denied); *see also Caldwell v. State*, 875 S.W.2d 7, 8 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) (per curiam); *Padilla v. State*, No. 01-89-01180-CR, 1992 Tex. App. LEXIS 3331, at *2-3 (Tex. App.—Houston [1st Dist.] 1994, no pet.). We overrule Gary's second issue.

**Issues concerning the contents of the charge**

In his third, fourth, and fifth issues, Gary complains of the district court's refusal to include in the charge various limiting instructions he had requested concerning Marsha's claim for intentional infliction of emotional distress. Additionally, in a supplemental brief, Gary attempts to raise an eleventh issue contending that the district court erred in submitting Marsha's intentional infliction claim at all.

---

[4] Gary adds that the district court failed to make explicit findings concerning the accuracy of the conformed charge and did not explicitly order its substitution for the original. Gary also suggests that Marsha failed to properly authenticate the twelve copies of the charge found by the district court and introduced as Exhibit 2. These complaints were waived by Gary's failure to raise them in the district court. *See* Tex. R. App. P. 33.1(a).

6

*Submission of intentional infliction claim*

In the eleventh issue he presents in his supplemental brief, Gary relies on *Hoffman-La Roche, Inc. v. Zeltwanger* in arguing that the gravamen of Marsha's intentional infliction claim was assault and that her redress was accordingly limited to recovery under that theory. 144 S.W.3d 438, 447-48 (Tex. 2004) (quoting *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998)) (explaining that intentional infliction of emotional distress is "gap-filler" tort whose purpose is to "supplement existing forms of recovery by providing a cause of action for egregious conduct" that might otherwise go unremedied). He observes that, for example, Marsha had pled claims for assault and battery, but did not submit them to the jury.

Gary did not, however, raise this argument either in the district court or in his initial appellate brief. He attempts to avoid waiver by characterizing *Zeltwanger* as "newly decided law." To the contrary, although *Zeltwanger* was decided after Gary filed his initial appellate brief, the legal principle for which Gary invokes it—that the tort of intentional infliction of emotional distress is a "gap filler" that does not lie where liability is determined by other torts or by statute—was first announced by the Texas Supreme Court in 1998. *See Standard Fruit & Vegetable Co.*, 985 S.W.2d at 68. *Zeltwanger*, in fact, relies heavily on *Standard Fruit*. 144 S.W.3d at 447-48. We conclude that Gary has waived any complaint that Marsha asserted what in substance is a claim for assault and battery that is not remediable under an intentional infliction theory.[5] *See* Tex. R. App. P. 33.1.

---

[5] We overrule Marsha's motion to reconsider our order granting Gary's motion for leave to file a supplemental brief or in the alternative, motion to strike Gary's supplemental brief.

***Refusal of limiting instructions***

*Standard of review*

We review a district court's decision to submit or refuse a particular jury instruction under an abuse-of-discretion standard of review. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000); *see Louisiana-Pacific Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998). The district court has considerable discretion to determine necessary and proper jury instructions. *In re V.L.K.*, 24 S.W.3d at 341.

*Proposed additional instruction regarding extreme and outrageous conduct*

The district court submitted the issue of Gary's liability for intentional infliction of emotional distress in Question 7 of the charge. The court included the following definitions:

> Intentional infliction of emotional distress occurs when the defendant acts intentionally or recklessly with extreme and outrageous conduct to cause the plaintiff emotional distress and the emotional distress suffered by the plaintiff was severe.

> "Extreme and outrageous conduct" occurs only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Gary complains of the district court's refusal of the following additional instruction:

> Conduct that is merely insensitive, or rude is not extreme and outrageous. Likewise, mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct.

Gary urges that this additional instruction was warranted so "that jurors not be allowed to consider the discord that exists in many failing marriages that lead to divorce that does not rise to the level of intentional infliction of emotional distress." He adds that "[w]hile name-calling and foul language is not aspirational behavior, it should not, particularly in the context of a divorce case, be considered by the jury as conduct for which damages can be awarded."

A district court must submit to the jury such instructions and definitions "as shall be proper to enable the jury to render a verdict." Tex. R. Civ. P. 277; *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 790 (Tex. 1995). For an instruction to be proper, it must (1) assist the jury; (2) accurately state the law; and (3) find support in the pleadings and the evidence. *See Texas Worker's Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000); Tex. R. Civ. P. 278. A court should refuse to submit unnecessary instructions even if they are correct statements of the law. *Id*. at 714.

The definition and instruction submitted by the district court tracked verbatim the exemplar in the pattern jury charge. *See* Tex. Pattern Jury Charges PJC 6.5 (2003). There is no dispute that the definition and instruction accurately states the law. *See Twyman*, 855 S.W.2d at 621-22. The district court properly instructed the jury that, to constitute "extreme and outrageous conduct," Gary's conduct must have gone "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

The district court did not abuse its discretion in determining that Gary's additional proposed instruction would not assist the jury. It is implicit that "mere insults, indignities, threats,

annoyances, petty oppressions, or other trivialities," as referenced in Gary's proposed instruction, do not go "beyond all possible bounds of decency" and are not "atrocious, and utterly intolerable in a civilized community." Courts need only submit those instructions that are necessary to enable the jury to render a verdict. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 841 (Tex. 2000); *Mandlbauer*, 34 S.W.3d at 912. Including additional instructions risks commentary on the evidence. *See In re V.L.K.*, 24 S.W.3d at 341; *Acord v. General Motors Corp.*, 669 S.W.2d 111, 116 (Tex. 1984).

In any event, we conclude that any error in the district court's refusal of this instruction was harmless. *See In re J.F.C.*, 96 S.W.3d 256, 279 (Tex. 2002). As previously discussed, Gary waived any complaint about the submission of an intentional infliction theory predicated on evidence of his physical abuse of Marsha. Thus, when finding liability and damages for intentional infliction, the jury could have considered evidence that, among other acts, Gary choked, beat, and raped Marsha. *Cf. Golden Eagle Archery Co. v. Jackson*, 116 S.W.3d 757, 763-70 (Tex. 2003); *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, No. 03-03-00376-CV, 2005 Tex. App. LEXIS 5949, at *51 (Tex. App.–Austin July 29, 2005, no pet. h.). In the face of such evidence and the substantial damages the jury awarded, it is unlikely that the judgment was caused by the jury's improper consideration of any "name-calling and foul language" falling below the standard of extreme and outrageous conduct. *See* Tex. R. App. P. 44.1(a)(1). We overrule Gary's third issue.

*Proposed mitigation submission*

In his fourth issue, Gary argues that the district court abused its discretion by refusing to submit a question or instruction on mitigation of damages.[6] The gist of Gary's failure-to-mitigate theory is that by returning to him after nearly divorcing him after the first episode of abuse seventeen days into their marriage, Marsha failed to "mitigate" her damages as a reasonably prudent person would have. Marsha responds that, among other things, Gary did not plead mitigation as an affirmative defense and that his claim, in substance, concerns not failure to mitigate but an unpled theory of comparative fault. We agree with Marsha.

Mitigation of damages involves action by the plaintiff which forestalls all or at least some of the damages suffered. *See Gunn Infiniti v. O'Byrne*, 996 S.W.2d 854, 857 (Tex. 1999). Failure to mitigate damages is usually an affirmative defense. *See*, *e.g.*, *O'Byrne*, 996 S.W.2d at 856-57 (claims under the Deceptive Trade Practices Act); *Austin Hill Country Realty v. Palisades Plaza*, 948 S.W.2d 293, 300 (Tex. 1997) (landlord-tenant context); *Gulf Consol. Int'l, Inc. v. Murphy*, 658 S.W.2d 656, 566 (Tex. 1983) (employee-employer context); *Brazos River Auth. v.*

---

[6] In his brief, Gary complains chiefly that the district court failed to submit a *question* on mitigation, but concluded that "this case should be reversed based upon the trial court's failure to submit the *instruction* on failure to mitigate damage." Marsha's brief refers only to a requested instruction. The record reflects that Gary requested both a separate question on mitigation and an instruction within the damages issue, Question 8:

> Do not include any amount for any condition resulting from the failure, if any, of Marsha Moyer to have acted as a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating her injuries, if any, that resulted from the occurrence in question.

We will assume that Gary complains of both rulings.

*Graham*, 354 S.W.2d 99, 111 (Tex. 1961) (eminent domain cases); *Computed Imaging Serv., Inc. v. Fayette Mem'l Hosp.*, No. 03-00-00322-CV, 2001 Tex. App. LEXIS 183, at \*10 (Tex. App.—Austin, Jan. 11, 2001) (not designated for publication) (contract disputes). In some cases, courts have recognized that a defendant in a personal injury case need not plead mitigation as an affirmative defense in order to show that a plaintiff failed to act with reasonable prudence in caring for and treating his or her injuries. *See Moulton v. Alamo Ambulance Serv., Inc.*, 414 S.W.2d 444, 448-49 (Tex. 1967) (failure to mitigate by care and treatment of personal injuries, such as failure to obey doctor's orders not affirmative defense). But this is not Gary's complaint. Instead, Gary argues that, in essence, Marsha is partly to blame for any injuries caused by his intentional beatings or abuse because she failed to deprive him of the opportunity to hurt her again by not leaving the marriage. Leaving aside whether Texas law would recognize such a legal theory as a matter of public policy, Gary's theory does not properly concern mitigation of damages, but comparative fault or consent, both of which are affirmative defenses. *See Kroger v. Keng*, 23 S.W.3d 347, 351 (Tex. 2000) (comparative fault); *Conoco Inc. v. Amarillo Nat'l Bank*, 996 S.W.2d 853, 853 (Tex. 1999) (per curiam) (consent); *see also Hudson v. City of Houston*, No. 14-03-00565-CV, 2005 Tex. App. LEXIS 173, at \*16 (Tex. App.—Houston [14th Dist.] January 6, 2005, no pet.) (mem. op.) (proportionate responsibility). Because Gary pled neither defense, they are waived. *See* Tex. R. Civ. P. 94; *Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex. 1991).[7] We overrule Gary's fourth issue.

---

[7] There are two exceptions to the rule that affirmative defenses must be pled: (1) if the plaintiff's pleadings anticipates that defense, and (2) regardless of the pleadings, courts will not violate public policy. *See*, *e.g.*, *Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex. 1991). Neither exception applies here.

*Proposed limitations instruction*

In his fifth issue, Gary asserts that the district court abused its discretion in refusing to submit a proposed jury question limiting damages "to the period prior to the statute of limitation." Both parties agree that the two-year statute of limitations applies to the claim of intentional infliction of emotional distress. *See* Tex. Civ. Prac & Rem. Code Ann. § 16.003 (West 2002). However, the parties dispute the accrual date of Marsha's claim. Generally, a cause of action accrues "when the wrongful act effects an injury, regardless of when the plaintiff learned of such an injury." *Id.* It is undisputed that acts made the basis of Marsha's intentional infliction claim began as early as 1991; her claim was not added until her second amended petition, filed September 7, 2001. Marsha relies on a limitations exception we have previously recognized for "continuing torts"; that is, torts that involve wrongful conduct inflicted over a period of time that is repeated until desisted, and each day creates a separate cause of action. *First Gen. Realty Corp. v. Maryland Cas. Co.*, 981 S.W.2d 495, 501 (Tex. App.—Austin 1998, pet. denied); *see Twyman v. Twyman*, 790 S.W.2d 819, 820-21 (Tex. App.—Austin 1990), *rev'd on other grounds*, 855 S.W.2d 619 (Tex. 1993); *see also Arquette v. Hancock*, 656 S.W.2d 627, 629 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.) (civil rights violations); *Adler v. Beverly Hills Hosp.*, 594 S.W.2d 153, 155 (Tex. Civ. App. 1980, no writ) (false imprisonment cases). Under this rule, a "continuing tort" does not accrue until the tortious act ceases. *First Gen. Realty Corp.*, 981 S.W.2d at 501; *Dickson Constr. v. Fidelity & Deposit Co.*, 960 S.W.2d 845, 851 (Tex. App.—Texarkana 1997, no pet.). However, the doctrine only applies if the last tortious act falls within the limitations period. *Bhalli v. Methodist Hosp.*, 896 S.W.2d 207, 212 (Tex. App.—Houston [1st Dist.] 1995, writ denied); *see First Gen. Realty Corp.*, 981 S.W.2d at 501.

13

Courts have held that intentional infliction of emotional distress is a continuing tort where the acts were not "complete in themselves" and involved a continuing course of conduct that cannot be traced to a single event. *See Twyman*, 790 S.W.2d at 821; *Franzetti v. Franzetti*, 120 S.W.2d 123, 126 (Tex. Civ. App. 1938, no writ); *see also Toles v. Toles*, 45 S.W.3d 252, 262 (Tex. App.—Dallas 2001, pet. denied); *Newton v. Newton*, 895 S.W.2d 503, 506 (Tex. App.—Fort Worth 1995, no writ). Instead, it is the cumulative effect of the conduct that, inflicted over a sufficiently lengthy period of time, caused injury over a period of years. *See Twyman*, 790 S.W.2d at 821; *see also GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 615 (Tex. 1999). Consequently, the cause of action is not complete and therefore should not accrue until the tortious acts have ceased. *Twyman*, 790 S.W.2d at 821.

We acknowledge that the Texas Supreme Court recently reserved judgment on whether it would recognize the continuing tort concept. It reversed an award of damages for intentional infliction of emotional distress, finding that certain post-termination conduct was not legally sufficient to rise to the level of intentional infliction of emotional distress. *See Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 815 (Tex. 2005). It observed that the Fort Worth Court of Appeals had invoked "the 'continuing tort doctrine,' a doctrine we have neither endorsed nor addressed, but that has been used by some courts of appeals to toll limitations until the last act of intentional infliction occurs." *Id*. at 816 n.8. The Court did not address the issue because it had not been appealed. *Id*. However, because our undisturbed precedent in *Twyman* continues to govern our analysis, we will continue to apply it unless and until the supreme court counsels us otherwise.

14

Under *Twyman*, the acts Marsha alleged and proved fit squarely within the definition of a continuing tort. *Twyman*, 790 S.W.2d at 821 (quoting 54 C.J.S. Limitations of Actions § 177, at 231 (1987)). The last tortious act alleged in Marsha's petition occurred on August 6, 2000, approximately thirteen months prior to the addition of the intentional infliction of emotional distress claim. Thus, Marsha filed suit within the two-year statute of limitations. Because she alleged a continuing tort, the district court did not abuse its discretion in refusing Gary's requested limiting instruction. *See* Tex. R. Civ. P. 278; *In re V.L.K.*, 24 S.W.3d at 341.

Additionally, we note that the requested limiting instruction would not have informed the jury of when the relevant two-year period began. The requested question stated "[d]id GARY L. MOYER intentionally inflict severe emotional distress upon Marsha Ann Moyer on or after (2 years before date of petition) [sic]?" The six petitions Marsha had filed were included as exhibits; her claim for intentional infliction of emotional distress appeared in her second amended petition and each subsequent amended petition. However, Gary's proposed question did not provide an accrual date for the cause of action, thus it is unlikely that the question would have assisted the jury or enabled them to render a verdict. *See* Tex. R. Civ. P. 277. We overrule Gary's fifth issue.

**Admission of expert testimony**

In his tenth issue, Gary argues that the district court erred by allowing Marsha's damages experts, Dr. Alaire Lowry and clinical social worker Sue Bickerton, to give undisclosed opinions, mental impressions, and rebuttal testimony. On appeal, Gary complains that Marsha's disclosures concerning these experts contained only "skeletal information" about the experts' testimony and opinions and that four categories of testimony should have been excluded: (1) Dr.

15

Lowry's opinion of Marsha's ability to be employed on a full-time basis; (2) Bickerton's testimony on the effect of battering over time on a battered spouse; (3) Bickerton's opinion that Marsha suffered severe emotional distress as a result of Gary's abuse; and (4) Bickerton's testimony, that during joint counseling sessions, Gary admitted to Bickerton that he abused his wife.[8]

A party may not introduce into evidence undisclosed expert opinions unless the court finds that there was good cause for the failure to disclose the matters in discovery or the failure will not unfairly surprise or prejudice the other party. Tex. R. Civ. P. 193.6(a). Here, the district court found that there was good cause to allow Lowry and Bickerton to testify regarding matters that may not have been disclosed in discovery and that the testimony did not cause unfair surprise or prejudice to Gary. Gary does not contend on appeal that the district court abused its discretion with regard to these findings. His tenth issue, accordingly, is without merit.

In any event, the district court's admission of all four categories of testimony Gary complains of, even if erroneous, would have been harmless. When erroneously admitted evidence is cumulative, the error is harmless. *GTE Southwest, Inc.*, 998 S.W.2d at 605. Furthermore, error in the admission of testimony is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004) (citing *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984)); *City of Houston v. Riggins*, 568 S.W.2d 188, 190 (Tex. Civ. App.—Tyler 1978, writ ref'd n.r.e.).

---

[8] At trial, Gary also sought to exclude these experts based on untimely designation, but does not press that contention on appeal.

Gary argues that the district court erred in allowing Lowry to testify that

> I think it's very difficult for [Marsha] to hold down a full-time job or even a part-time job at this point that takes her out of the house. Even a job that would—that she would be able to maintain from home would be very difficult for her because of the self doubt, of the difficulty thinking, and of the fear of contact with other people.

The testimony was introduced to establish Marsha's loss of earning capacity. Prior to this testimony, however, Lowry had already testified, without objection, about Marsha's major depression, her total lack of "confidence in herself as being able to hold down a job," and that Marsha was too afraid to apply for or hold down a job because she was "afraid that she will not be safe going to and from the job if people know where she is." The testimony Gary now complains of is merely cumulative of this prior testimony. Furthermore, Bickerton's testimony closely paralleled Lowry's testimony when Bickerton testified, without objection, about Marsha's lack of ability to work on a full or part-time basis. Gary rendered harmless any error in the admission of Lowry's testimony by failing to object to the previous introduction of the same or similar evidence. *See Ramirez*, 159 S.W.3d at 907; *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 230 (Tex. 1990).

Next, Gary argues that the district court erred in allowing Bickerton, when asked about the effects of battering on the victim, to testify that:

> Over time, the victim begins to doubt any decision they might make. They begin to isolate. Usually, they are isolated anyway, but they isolate more because they're ashamed. They don't want people to know. They don't want people to see any bruises or—or cuts or whatever. They tend to start blaming themselves for the abuse. "It must have been me. What did I do wrong?" Obviously, depression, anxiety, all of that starts. They tend to get so intimidated and so beaten down emotionally that really their ability to—to think about other options is very limited as far as leaving—leaving the relationship, that sort of thing. Low self-esteem, as I say,

doubting everything, being pretty hypervigilant, when is it going to happen, those sorts of things.

However, Bickerton had previously testified, without objection regarding disclosure of the opinion, about the symptoms that long-term abuse victims suffer, the traditional cycle of abuse, and the various phases of battering between a husband and wife. This prior testimony had the same effect of establishing that Marsha suffered severe emotional distress. Therefore, any error was harmless. *See Ramirez*, 159 S.W.3d at 907; *Culpepper*, 802 S.W.2d at 230.

Gary next contends that Bickerton was improperly allowed to offer the opinion that Marsha suffered severe emotional distress as a result of her relationship with him. The district court overruled Gary's objection to Bickerton's testimony regarding past severe emotional distress. However, Gary did not object to Bickerton's testimony regarding ongoing and future severe emotional distress; thus, any complaints regarding those issues are waived. *See id.* And Bickerton's testimony regarding Marsha's past severe emotional distress is cumulative because Lowry also testified that Marsha had suffered severe emotional distress in the past.[9] Because the testimony is cumulative, any error is harmless. *See Culpepper*, 802 S.W.2d at 230.

A week after Bickerton was excused as a witness following her testimony in Marsha's case-in-chief, Marsha called her as a rebuttal witness. Bickerton recounted that Gary had divulged to her, in joint counseling, that he had physically abused Marsha. Gary complains first that Bickerton should not have been allowed to offer this testimony in rebuttal. Next, he asserts that this

---

[9] Lowry further testified that Marsha still suffers and will continue to suffer severe emotional distress in the future, which also renders the testimony cumulative.

18

was opinion testimony not disclosed during discovery. Rebuttal evidence goes only to disprove facts already in evidence by an adverse party. *In re Bledsoe*, 41 S.W.3d 807, 813 (Tex. App.—Fort Worth 2001, no pet.). Rebuttal evidence must be offered to rebut other evidence, not as a part of the proponent's case-in-chief. *Waldrep v. Texas Employers Ins. Ass'n.*, 21 S.W.3d 692, 706 (Tex. App.—Austin 2000, pet. denied). Bickerton's revelation that Gary had admitted to physically abusing Marsha was limited to, and directly responded to, Gary's testimony in which he repeatedly denied physically abusing Marsha. Gary's testimony denying that he physically abused Marsha provided a reasonable ground for Bickerton to testify as a rebuttal witness. Therefore, we find that the district court did not abuse its discretion in allowing her testimony. *Lindgren*, 936 S.W.2d at 426.[10] We overrule Gary's tenth issue.

**Sufficiency of damages evidence**

In his sixth and seventh issues, Gary contends that there is insufficient evidence to support the jury's verdict awarding damages for lost earning capacity and severe emotional distress.

---

[10] Furthermore, Bickerton's testimony was cumulative of earlier testimony from Gary's professional counselor, Nelson Nagle, who had stated that Bickerton had told him that Gary had admitted abusing Marsha. While Nagle's statement did not distinguish between verbal and physical abuse, the question and answer came immediately after a discussion about physical abuse. The implication of Nagle's testimony was that Gary had admitted to physically abusing Marsha. Consequently, any error in the admission of Bickerton's testimony was harmless. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004); *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 230 (Tex. 1990).

*Standard of review*

When reviewing the legal sufficiency of evidence, we will reverse the judgment only when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; [or] (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, No. 02-1012, 2005 Tex. LEXIS 436, at *11 (Tex. Jun. 10, 2005) (quoting Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361 (1960)). More than a mere scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Minyard Food Stores v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002).

When considering whether more than a mere scintilla of evidence exists to prove a vital fact, we view the evidence in a light most favorable to supporting the verdict and will consider "only the evidence and the inferences which support the finding," not those that are contrary to the finding. *Id*. at *1-2. However, as *City of Keller* explains, this does not mean that contrary evidence will be completely disregarded, as it may be relevant in alternative situations. *Id*. For example, in reviewing the legal sufficiency of intentional infliction of emotional distress claims, we consider the context and the relationship between the parties. *Id*. We will review "not just evidence showing the conduct was outrageous, but also evidence showing that, in context, it was not." *Id*. at *15.

When reviewing a challenge to the factual sufficiency of evidence, we must consider, weigh, and examine all of the evidence in the record. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d

442, 445 (Tex. 1989). A party attacking the factual sufficiency of an adverse finding on which the other party had the burden of proof must demonstrate that there is insufficient evidence to support the adverse finding. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.—Austin 1995, no writ). We will set aside the verdict only if the evidence that supports the finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

An important limitation on our sufficiency review is that the determination of the credibility of witnesses is generally left to the jury. *See City of Keller*, 2005 Tex. LEXIS 436, at *33; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

### *Past and future severe emotional distress*

In his seventh issue, Gary challenges the legal and factual sufficiency of the evidence to support the jury's award of $240,000 for severe emotional distress Marsha suffered in the past and $100,000 for future severe emotional distress. Before determining whether the evidence sufficiently supports the *amount* the jury awarded to Marsha, we must first determine whether the jury was justified in awarding *any* damages for severe emotional distress. *See Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).

An award of mental anguish damages will survive a legal sufficiency challenge when there is direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiff's daily routine. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995); *Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 579 (Tex. App.—Austin 2003, no pet.) (citations omitted). We apply traditional no-evidence standards to

21

determine whether the record reveals any evidence of "a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Parkway Co.*, 901 S.W.2d at 444 (citations omitted); *Hamrick*, 125 S.W.3d at 579 (Tex. App.—Austin 2003, no pet.) (citations omitted). Direct evidence may be in the form of the party's own testimony, that of third parties, or that of experts. *Parkway Co.*, 901 S.W.2d at 444.

Numerous witnesses testified about the severe emotional distress Marsha suffered, including Marsha herself, as well as experts Lowry and Bickerton. Although Gary unsuccessfully challenged the admissibility of the experts' testimony on procedural grounds, he does not challenge on appeal their qualifications or the reliability of any opinions they offered. *See Ramirez*, 159 S.W.3d at 904; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). Lowry testified that, for several months, she had been treating Marsha for depression and that, over the course of a "very traumatic" twelve or thirteen-year marriage, Gary

> hurt her in so many ways, by humiliation, by threatening to kill her, by telling her that she was crazy and worthless, by saying such things as—well, such things as, "We're here out in the country. No one will hear a gunshot," by inciting horses to . . . jump on her when she was in the stall with them, just numerous occasions that—that she told me about that would—would convince a person that someone gets pleasure from hurting you.
>
> . . .
>
> Mr. Moyer had choked [Marsha] on numerous occasions as well as doing other very dangerous things like putting his foot on top of her foot when it was on the accelerator of a car and other things, but at this time, she said she thought—she—apparently, she came very close to blacking out and she thought—and she made a pact with God, she told me, "If you let me live, I promise I will leave him."

22

Lowry recounted that Marsha "still has nightmares about it. She still has flashbacks about it." Marsha was in such "abject terror" of Gary that Lowry had "seen [Marsha] mute with terror in my office." Furthermore, Lowry diagnosed Marsha with major depressive disorder, explaining that

> in order to be diagnosed with major depression, there must be a depressed mood most of the day, nearly every day, markedly diminished interest in all or almost all activities nearly every day, insomnia or hypersomnia—in other words, sleeping all the time as opposed to not being able to sleep—nearly every day, fatigue or loss of energy nearly every day, feelings of worthlessness or inappropriate guilt nearly every day, diminished ability to think or concentrate or make decisions nearly every day, and recurrent thoughts of death or suicidal ideation. And in order to diagnose major depression, the patient must have at least two episodes of this in their past history and with [Marsha], I'm quite confident that she has had far more than two.

Lowry testified that Marsha has had every single symptom and that "there's no doubt in my mind that [Marsha] meets those criteria." As a result, Lowry testified, Marsha has withdrawn herself from society, is hiding, lacks self-confidence, and is afraid to get a job. Lowry concluded that these symptoms have "devastated" Marsha's psyche and that she has suffered, currently suffers, and will continue to suffer severe emotional distress.

Lowry added that Marsha's major depressive disorder is different than depression that others may feel over the loss of a marriage or job. For example, Marsha's depressive disorder interfered with her functioning over the long term, caused her to question "the basic worth of the self," and "retreat from life in general over the long term." Lowry explained that it was "clear" to her that "the real decrement in functioning, in other words, her withdrawal from society, hiding, total lack of her—confidence in herself as being able to hold down a job, being able to relate to people,

23

being able to protect herself occurred as a result of this, a very traumatic twelve or thirteen years . . .

of being married to Gary."

Bickerton's testimony was similar to that of Lowry. Bickerton diagnosed Marsha

with severe post-traumatic stress disorder attributable to her abusive relationship with Gary.

Bickerton further testified that

> [s]ome of the symptoms that one has when they have post traumatic stress disorder are a lot of flashbacks of the—of events that happened; a lot of obsessing on those events because of the fear of them happening again; difficulty sleeping; high anxiety; lots of times, either a weight loss or a weight gain. It can be one or the other depending on how different people cope. Easily triggered; I mean, something small can happen. Somebody can be watching a movie and just a certain word is said or—or it turns out it's a movie about abuse, and then they can go right back into their trauma as if it—it was happening to them at the moment. Depression, quite a bit of depression generally; low self-esteem; a lot of—sometimes minimizing it because why did I stay, that sort of thing. . . . Tend to not trust their own judgments, their own decisions, their own opinions, need a lot of excessive reassurance, that sort of thing.

Like Lowry, Bickerton concluded that Marsha has suffered, currently suffers, and will

continue to suffer severe emotional distress.

Marsha also testified that, prior to her marriage with Gary, she was "outgoing,

assertive, happy, [and] sure of [herself.]" However, soon after being married,

> Gary would tell me I was worthless. He would tell me I was stupid, that my opinion didn't matter. He would tell me I was a nobody. He told me that I couldn't make it in this world without his net . . . [that] you don't have anybody. You're a bad mother . . . [that] no wonder your [first] husband . . . ran around on you; you're not much of a woman.

24

Marsha testified that Gary would scream "I want to see you cry" and the more she cried, the more he laughed, and told her "the problem with the world today is there's just not enough pain." Marsha further testified that it was "common" for Gary to leave marks on her neck from choking her. She "started having problems breathing, congestions . . . my right eye started watering. And . . . [m]y face was black and blue. I was bruised all over. I had—I remember also when I put that towel to my . . . face . . . [t]here was blood all over the towel when I took it away." As a result, Marsha now considers herself a "wimp" and a "scaredy cat"; she hides and is withdrawn from others. Furthermore, Marsha has "lost a lot of weight," has tremors, can't sleep well, and has problems with her "heart kind of racing." Finally, Marsha, as well as Lowry and Bickerton, testified that she has undergone psychological counseling and has taken and continues to take five different medications to treat her various psychological problems.

Several friends and relatives echoed these changes in Marsha's personality and the severe emotional distress she suffered. Roma Schubert, Marsha's friend, testified that Marsha is now "always jumpy" and is "very anxious." Amanda Wylie, Marsha's daughter from her previous marriage, tearfully testified that she saw bruises on Marsha's arms, chest, and back. When Ms. Wylie questioned her, Marsha said that "she didn't want to talk about it and she was scared and she didn't know what to do." Wylie stated that Marsha's emotional well being has changed; "she has no self esteem anymore. She feels like she's nothing. She used to be so outgoing, just fun-loving. She—she thought of herself so high on a pedestal and she—she feels like she has no self-esteem anymore." Furthermore, Rick Wilborn, Marsha's ex-husband, testified that Marsha used to be a

25

very dynamic, outgoing, . . . somewhat extroverted and just very energetic when it came to her professional career and her professionalism and the way she conducted herself and the way she talked to people. She stared at them straight in the eyes and wouldn't take anything off anybody.

Now, Mr. Wilborn had seen a change in Marsha such that her self-esteem is "I'm not going to say gone, but it's very, very much different than it used to be . . . she seemed to speak talking down to the floor. She is shaky at times. She doesn't exude confidence and she's not the woman that I used to know, again, in all due respect."

On the other hand, Gary presented testimony of several co-workers, neighbors, and others with frequent, if not daily, contact with Marsha. Each of these witnesses, as well as Gary himself, testified that they noticed none of the symptoms Marsha complained of, nor did they notice any general change in her personality. The jury was free to determine whose accounts it believed most credible. *See City of Keller*, 2005 Tex. LEXIS 436, at *33. The detailed testimony of Marsha, her family, friends, and experts constitutes direct evidence of the nature, duration, and severity of Marsha's mental anguish, establishing a substantial disruption in her daily routine. *Woodruff*, 901 S.W.2d at 444; *Hamrick*, 125 S.W.3d at 579. It is also more than a mere scintilla of evidence to support an award for severe emotional distress. *See City of Keller*, 2005 Tex. LEXIS 436, at *11; *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). Furthermore, the evidence is not so weak that the jury was clearly wrong and manifestly unjust in its decision. *See Cain*, 709 S.W.2d at 176. We find the evidence legally and factually sufficient that Marsha suffered severe emotional distress.

26

Having determined that the jury was justified in awarding Marsha damages for the severe emotional distress Gary inflicted upon her, we consider whether sufficient evidence exists to support a finding that the *amount* the jury awarded was fair and reasonable. *See Saenz*, 925 S.W.2d at 614. Although the impossibility of any exact valuation requires that juries be given a measure of discretion in finding damages, there are some limits on that discretion. *See id*. A jury must find an amount that would fairly and reasonably compensate for the loss; however, juries cannot simply pick a number and put it in the blank. *Id*.; *Hamrick*, 125 S.W.3d at 579.

In her closing argument, Marsha's attorney asked for damages for the last twelve years, arguing that "if you give her $20,000 a year for the past, again, $2.28 an hour for this severe emotional distress, that's $240,000 in the past." The jury awarded exactly the amount that Marsha had requested. For future emotional distress, Marsha argued that she should be compensated $10,000 per year for the next 25 years, or a total of $250,000. However, the jury awarded only $100,000 for future emotional distress, consistent with an award of $10,000 per year for ten years under Marsha's proposed calculation.

In other cases, we have looked to the ratio of mental-anguish damages to other damages to determine if the award for emotional distress is excessive. *See Hamrick*, 125 S.W.3d at 580-81 (holding that ratios of mental-anguish damages to injury-to-reputation damages of 2.5 to 1 and 5 to 1 were not excessive). The ratio of Marsha's damages for severe emotional distress compared to the damages the jury awarded for her loss of future and past earning capacity is almost

27

exactly 1 to 1.[11]  Nor is the jury's total award of $340,000 for severe emotional distress out of proportion with similar cases in Texas.  *Cf.*, *e.g.*, *Ross v. Ross*, No. 03-02-00771-CV, 2004 Tex. App. LEXIS 3395, at *33 (Tex. App.—Austin Apr. 15, 2004, no pet.) (mem. op.) (affirming award of $150,000 for mental anguish to spouse who suffered physical abuse, major depression, and post traumatic stress disorder); *Toles*, 45 S.W.3d at 260 (reinstating jury verdict awarding wife $325,000 for her intentional infliction of emotional distress claim where evidence showed that husband mentally and physically abused wife, causing her to suffer from ulcer, severe depression, and post-traumatic stress disorder); *Massey*, 807 S.W.2d at 400 (upholding award of $362,000 to wife for intentional and negligent infliction of emotional distress where evidence showed that wife's psychologist diagnosed husband as having explosive personality disorder and characterized wife as emotionally battered).

Finally, the fact that Marsha had requested $60,000 for future physical pain but was awarded zero demonstrates that the jury carefully considered each damage issue.  *See id*. at 581; *Schindler Elevator Corp. v. Anderson*, 78 S.W.3d 392, 415 (Tex. App.—Houston [14th Dist.] 2001, pet. granted, judgm't vacated w.r.m.).

We hold that there is more than a mere scintilla of evidence to support the jury's total award of $340,000 for past and future emotional distress.  *See Hamrick*, 125 S.W.3d at 580-81. Furthermore, the evidence is not so weak that the jury was clearly wrong and that awarding $340,000 was manifestly unjust.  *See Cain*, 709 S.W.2d at 176.  We overrule Gary's seventh issue.

---

[11] The figures are $340,000 past and future severe emotional distress versus $330,000 past and future lost earning capacity.

28

*Past earning capacity*

Gary next argues that there is legally or factually insufficient evidence to support the jury's $120,000 award for past lost earning capacity. Loss of earning capacity is the plaintiff's diminished capacity to earn a living. *Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 35 (Tex. App.—Tyler 2003, pet. denied) (citing *Metropolitan Life Ins. Co. v. Haney*, 987 S.W.2d 236, 244 (Tex. App.—Houston [14th Dist.] 1999, pet. denied)). Although a plaintiff is unemployed, he or she may still recover for lost earning capacity if the elements of those damages are proven. *Plainview Motels, Inc.*, 127 S.W.3d at 35.

Marsha's claim for past lost earning capacity was based on her last day of work for Gary's company, August 7, 2000, until the time of trial at the end of July 2003. Gary points to testimony that Marsha had never told Bickerton, her therapist, that she had experienced problems functioning at work. However, Bickerton later testified that Marsha was unable to hold down a job at the time of trial and had been unable to hold down a job since Bickerton began seeing Marsha in November 2000. Furthermore, Lowry testified that, as a result of the emotional distress inflicted by Gary, Marsha suffered from tremors, insomnia, post traumatic stress disorder, and a lack of self-esteem causing "a real decrement in functioning" preventing her from properly functioning at work. Furthermore, Lowry opined that "I think it's very difficult for [Marsha] to hold down a full-time job or even a part-time job at this point that takes her out of the house. Even a job that . . . she would be able to maintain from home would be very difficult for her because of the self-doubt, of the

29

difficulty thinking, and of the fear of contact with other people." When asked about the past three years since August 2000, Lowry responded "I think it would be so much worse than it is today."

Armed with evidence that Marsha was making $40,000 annually with benefits working for Gary's company, the jury had a reasonable basis for determining that she suffered three years' loss of past earning capacity and that $120,000 was an appropriate amount to award Marsha for her loss. There was more than a mere scintilla of evidence behind the jury's award of $120,000; the evidence is also not so weak that the jury was clearly wrong and manifestly unjust in its decision. *See Cain*, 709 S.W.2d at 176.

### Future earning capacity

Also in his sixth issue, Gary challenges the legal and factual sufficiency of the evidence supporting the jury's award of $210,000 for lost future earning capacity. His chief contention is that Marsha failed to explain why, after years of working while being abused, she was "suddenly unable" to earn a living.

Loss of future earning capacity is the plaintiff's diminished capacity to earn a living after the trial. *Tagle v. Galvan*, 155 S.W.3d 510, 519 (Tex. App.—San Antonio 2004, no pet.). Because the amount of money a plaintiff might earn in the future is always uncertain, the jury has considerable discretion in determining the amount. *Id.*; *Plainview Motels, Inc.*, 127 S.W.3d at 35. To support an award of damages for loss of future earning capacity, the plaintiff must introduce evidence sufficient to allow the jury to reasonably measure earning capacity in monetary terms.

*Tagle*, 155 S.W.3d at 519; *Plainview Motels, Inc.*, 127 S.W.3d at 35-36. The plaintiff can introduce evidence of past earnings; the plaintiff's stamina, efficiency, and ability to work in light of the injury; the weaknesses and changes that will naturally result from the plaintiff's injury; and the plaintiff's work-life expectancy. *See Tagle*, 155 S.W.3d at 519; *see also Plainview Motels, Inc.*, 127 S.W.3d at 36. Although Marsha was not required to prove actual earnings, life expectancy, or employment, there must be some evidence that she previously had the capacity to work, and that her capacity was impaired as a result of Gary's actions. *See Tagle*, 155 S.W.3d at 520; *Plainview Motels, Inc.*, 127 S.W.3d at 36.

There is no dispute that Marsha had the capacity to work prior to her marriage to Gary and the subsequent abuse. Gary only challenges the time period for which her capacity was impaired. He points out that Marsha's own expert, Lowry, testified that Marsha could probably return to work and be gainfully employed within three to six months. Actually, Lowry stated that "[w]ithin the next three to six months, I would *hope* she would be able to . . . get back to work." (Emphasis added.) Nonetheless, when asked to quantify the additional period of time in the future during which Marsha's ability to function at work would be impaired, Bickerton testified that Marsha may always be somewhat impaired, even twenty or thirty years from now, but the majority of her impairment should be overcome "anywhere from three to five or six years" after "everything is settled." Bickerton's unchallenged testimony is legally and factually sufficient evidence of future lost earning capacity. Moreover, we note that the jury could also have reasonably inferred that, although Marsha had worked for Gary for several years, such employment was merely a facet of his

31

overarching pattern of abuse, degradation and control, and that her future earning capacity had already been damaged in a manner not reflected in the salary that Gary was paying her.

Therefore, the jury heard evidence of Marsha's prior annual salary of $40,000 in addition to substantial benefits, evidence that Gary caused Marsha to suffer severe emotional distress, and Bickerton's testimony that Marsha's ability to work will be severely impaired for five or six years. The amount awarded is equal to five years of work at an annual salary of $40,000 plus $2,000 in annual benefits. We find that there is more than a mere scintilla of evidence to support both an award of lost future earning capacity, and an award in the amount of $210,000. Furthermore, the award is not so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176. Consequently, we hold that the award for lost future earning capacity is legally and factually sufficient. We overrule Gary's sixth issue.

**Admission of prior acts evidence**

In his eighth issue, Gary contends that the district court erred by allowing testimony regarding abusive acts he committed in a previous marriage. During cross-examination, Marsha's attorney elicited testimony from Gary's professional counselor, Nelson Nagle, that Gary had abused his wife in a previous marriage. In his eighth issue, Gary contends the testimony should have been excluded because it contained improper character evidence and was more prejudicial than probative. *See* Tex. R. Evid. 403, 404(b). However, Gary opened the door to this cross-examination during his direct examination of Nagle.

32

Gary's attorney asked Nagle to render an opinion as to Gary's psychological profile, including any psychological disorders. Next, he confirmed that Nagle was aware that Marsha was alleging that Gary physically abused her, and that Nagle had experience with people who had been involved in physical abuse in their marriages. He then asked Nagle, "[B]ased on what you know about Gary Moyer, does he meet the criteria for someone who would abuse their spouse?" Nagle responded to the question by analyzing whether anyone could state certain criteria for individuals who abuse their spouse, and concluding that he "couldn't make a statement on that." Gary's attorney also asked for Nagle's opinion on whether parents and grandparents have an impact on personality and conduct. Nagle responded that "each one of us is the sum product of all of our life's experiences, that none of our personalities are void of every experience that we've had."

Gary's questions to Nagle and his responses regarding the criteria for spousal abuse and the origin of personality and certain conduct opened the door for Marsha's cross-examination concerning Gary's physical abuse of her and his previous spouse. *See Southwestern Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 473 (Tex. 1998) (party on appeal should not be heard to complain of admission of improper evidence offered by other side when he, himself, introduced same evidence or evidence of similar character); *Sears v. Abell*, 157 S.W.3d 886, 897 (Tex. App.—El Paso 2005, pet. filed); *Moore v. Bank Midwest, N.A.*, 39 S.W.3d 395, 402 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). Additionally, once a party has put his character in issue by introducing reputation or opinion testimony of character witnesses, the opposing party may cross-examine the character witnesses. *See State Bar of Texas v. Evans*, 774 S.W.2d 656, 658 (Tex. 1989). Furthermore, because Nagle was offered as an expert witness, Marsha was permitted to ask

33

Nagle to disclose the underlying facts he used to form his opinion regarding Gary. *See* Tex. R. Evid. 705(a). Therefore, the district court did not abuse its discretion in permitting the testimony. *See Lindgren*, 936 S.W.2d at 426. We overrule Gary's eighth issue.

**Violations of the motion in limine**

In his ninth issue, Gary argues that the district court erred by failing to grant a mistrial after Marsha's expert witness violated the court's orders on a motion in limine. In a separate proceeding, Gary was convicted of criminal assault against Marsha arising from the August 6, 2000 incident. *See Moyer v. State*, No. 03-02-00459-CR, 2003 Tex. App. LEXIS 4713, at *32 (Tex. App.—Austin June 5, 2003, pet. ref'd) (mem. op.). Although we had affirmed the judgment, Gary's petition for discretionary review was pending at the time of the trial in this proceeding. *See id.* The order in limine barred any reference, prior to a ruling from the court outside the presence of the jury, to "an arrest, police report, any restraining order, trial, conviction, and any appeal." While conducting voir dire, Marsha's attorney asked the veniremembers whether they knew any of Gary's attorneys, including "[d]oes anybody know Mr. David Botsford, who's an appellate criminal defense attorney that Mr. Moyer has hired?" Gary objected to the question as a violation of the motion in limine and requested that the jury panel be struck. The district court sustained the objection and instructed the jury panel to disregard the statement but overruled the request to strike the panel.

Subsequently at trial, Marsha's accounting expert, while reviewing purchases by Paper Resource International, stated that "there were some for Mr. Moyer's criminal lawyer – I'm sorry." Gary's attorney moved for a mistrial. The district court denied the motion and instructed the jury to disregard the statement.

34

Gary argues that the cumulative effect of these two violations on the same "extraordinarily prejudicial issue" is incurable and constitutes grounds for reversal. We review the refusal to grant a mistrial under an abuse of discretion standard. *Champion Int'l Corp. v. Twelfth Court of Appeals*, 762 S.W.2d 898, 899 (Tex. 1988). When the basis for the requested mistrial is a violation of a motion in limine, we review the violations to see if they were curable by an instruction to the jury to disregard the statement. *See Lohmann v. Lohmann*, 62 S.W.3d 875, 881 (Tex. App.—El Paso 2001, no pet.); *Weidner v. Sanchez*, 14 S.W.3d 353, 363 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *Fort Worth Hotel Ltd. P'ship v. Enserch Corp.*, 977 S.W.2d 746, 757 (Tex. App.—Fort Worth 1998, no pet.). Generally, an instruction to disregard is presumed to be sufficient to cure any error resulting from the violation of a motion in limine. *Watson v. State*, No. 03-01-00258-CR, 2002 Tex. App. LEXIS 5737, at *13 n.2 (Tex. App.—Austin 2002, pet. ref'd). Although rare, a violation is incurable if the instruction to disregard does not eliminate the danger of prejudice or is calculated to inflame the minds of the jury. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839-40 (Tex. 1979); *McGinnis v. State*, No. 03-99-00824-CR, 2001 Tex. App. LEXIS 3171, at *2-3 (Tex. App.—Austin May 17, 2001, no pet.); *Lohmann*, 62 S.W.3d at 881. When determining whether a violation was curable, we consider whether there were numerous violations, if the violation(s) were inadvertent, whether the instruction to disregard was given promptly, the length of the trial, and the context of the statement that violated the motion. *See, e.g.*, *Watson*, 2002 Tex. App. LEXIS 5737, at *13; *Nat'l Union Fire Ins. Co. v. Kwiatkowski*, 915 S.W.2d 662, 664-65 (Tex. App.—Houston [14th Dist.] 1996, no writ).

Gary alleges only two momentary lapses violating the motion in limine during a trial that lasted nearly two weeks. Considering the abundance of testimony and other evidence the jury considered, these violations were not numerous. Furthermore, there is no evidence that the violations were anything but inadvertent. The first violation occurred during the routine procedure of running down the list of counsel related to the matter to determine whether venire members knew any of them. Marsha's attorney mentioned Botsford's identity as the fifth in a list of seven individuals he inquired about. She apologized twice and there is no evidence to suggest that the disclosure of Botsford's identity was anything but inadvertent. The district court promptly instructed the jury to disregard this statement.

The second violation occurred four days later when Marsha's accounting expert briefly noted that some of the expenses for Paper Resource International were "for Mr. Moyer's criminal lawyer—I'm sorry." Like the first violation, there is also no evidence that this violation was anything but inadvertent. Before Gary's lawyer could object, the witness, realizing his mistake, immediately apologized for mentioning the criminal lawyer. The fact that the witness realized his mistake before anybody else could alert him of it suggests that Marsha had properly instructed the witness not to mention anything related to the criminal case. The context of this statement also suggests that it was an innocent mistake. The purpose of the witness's testimony was to establish Gary's relationship with his company and the company's financial status, not to establish the grounds for a divorce or for the intentional infliction of emotional distress claim. Finally, like the first violation, the district court promptly instructed the jury to disregard this statement.

36

Moreover, the harmless error rule applies to the violation of a motion in limine prohibiting discussion of criminal proceedings. *See State ex rel. Hightower v. Smith*, 671 S.W.2d 32, 36 (Tex. 1984). In *Smith*, the State filed suit to remove Smith as county sheriff after the jury found him guilty of official misconduct for misappropriating county vehicles and fuel to patrol an apartment complex in order to obtain a rent-free apartment. *Id*. at 33. The apartment manager was asked whether there came a time when she determined that the arrangement with Smith was unsatisfactory. *Id*. at 36. She answered, "Yes, when he got indicted." *Id*. Smith's attorney immediately objected and moved for a mistrial, noting that the trial court had sustained his motion in limine excluding references to the criminal charges. *Id*. The objection was sustained, and the jury was instructed to disregard the statement. *Id*. The court noted that the criminal proceedings were not mentioned again, that the record showed that Smith's civil and criminal cases generated a great deal of publicity, and the potential jurors were thoroughly screened during voir dire on the subjects of bias and predisposition. *Id*. Assuming that those impaneled were impartial and capable of following the trial court's instruction, the court found that there was no harmful error. *Id*. (citing *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835 (Tex. 1979)).

Similarly, considering the facts surrounding the two violations of the motion in limine in this case, we find that the district court's instructions to the jury to disregard the statements adequately cured the violations and that the denial of the mistrial was not harmful error. By promptly instructing the jury to disregard the statements, the district court eliminated any reasonable danger of prejudice. Other evidence presented strongly supports Marsha's claims, and we conclude that the comments were not harmful considering the record as a whole. We hold that the district

court did not abuse its discretion in refusing to grant a mistrial. *See Lindgren*, 936 S.W.2d at 426.

We overrule Gary's ninth issue.

## CONCLUSION

Having overruled all of Gary's issues, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed:   August 26, 2005

38